1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3          HONORABLE DALE S. FISCHER, U.S. DISTRICT JUDGE

4

5   SECURITIES AND EXCHANGE        )
    COMMISSION,                    )
6                                  )
                    PLAINTIFF,     )
7                                  )
           vs.                     ) No. CV 19-2188-DSF-MRW
8                                  )
    DIRECT LENDING INVESTMENTS     )
9   LLC,                           )
                                   )
10                  DEFENDANT.     )
    _____)

11

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15              MONDAY, OCTOBER 7, 2019

16                   1:30 P.M.

17              LOS ANGELES, CALIFORNIA

18

19

20

21

22   _____

23          **CHIA MEI JUI, CSR 3287, CCRR, FCRR**
             FEDERAL OFFICIAL COURT REPORTER
24          350 WEST FIRST STREET, ROOM 4311
             LOS ANGELES, CALIFORNIA 90012
25              cmjui.csr@gmail.com

```
1    APPEARANCES OF COUNSEL:

2    FOR THE PLAINTIFF:

3            U.S. SECURITIES AND EXCHANGE COMMISSION
             BY:  AMY JANE LONGO, ATTORNEY AT LAW
4            444 SOUTH FLOWER STREET, SUITE 900
             LOS ANGELES, CALIFORNIA 90071
5            (323) 965-3835

6
     FOR BRADLEY D. SHARP:
7
             DIAMOND MCCARTHY LLP
8            BY:  KATHY BAZOIAN PHELPS, ATTORNEY AT LAW
             1999 AVENUE OF THE STARS, SUITE 1100
9            LOS ANGELES, CALIFORNIA 90067
             (310) 651-2997
10

11   FOR BRENDAN ROSS:

12           SHARTSIS FRIESE LLP
             BY:  JAHAN P. RAISSI, ATTORNEY AT LAW
13           ONE MARITIME PLAZA, 18TH FLOOR
             SAN FRANCISCO, CALIFORNIA 94111
14           (415) 421-6500

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            LOS ANGELES, CALIFORNIA; MONDAY, OCTOBER 7, 2019

 2                            1:30 P.M.

 3                             - - -

 4            THE CLERK:  Calling CV 19-2188-DSF, Securities and

 5   Exchange Commission versus Direct Lending Investments, LLC.

 6            Counsel, please step forward and state your

 7   appearances.

 8            MS. LONGO:  Good afternoon.  Amy Longo on behalf

 9   of plaintiffs, Securities and Exchange Commission.

10            MS. PHELPS:  Kathy Phelps of Diamond McCarthy on

11   behalf of Bradley Sharp, the receiver of the DLI entities.

12            MR. RAISSI:  Jahan Raissi on behalf of non-party,

13   Brendan Ross.

14            THE COURT:  Good afternoon.  It might be most

15   efficient to review the proposed order and see exactly what

16   the issues are.  So seeing "The motion and all relief sought

17   therein is granted" is kind of troublesome because then I

18   don't know what you mean other than what's listed in 2.  So

19   I am not going to do that.

20            The first item is confirming that the receiver has

21   the power to assert or waive all the attorney-client

22   privilege rights of those entities.

23            So does Mr. Ross have any objection to that as

24   it's phrased?

25            MR. RAISSI:  Yes, Your Honor, of course, because
```

 1    that's incredibly sweeping and broad, and it would be

 2    subject to any joint representations and the common interest

 3    joint defense agreement that exists here.

 4            THE COURT:  Do you have any problem just with the

 5    "or waive" language?

 6            MR. RAISSI:  That's right, Your Honor.  Of course,

 7    they're welcome to assert the privilege.  It's the waiver

 8    and then sharing with third-party which would constitute a

 9    waiver that we have an objection to.

10            THE COURT:  I think that can be handled in a

11    different paragraph.  B is "The receiver is authorized to

12    obtain copies of client files," et cetera.

13            And I think the issue that I have there is it's

14    "as set forth in any engagement letter in possession of" --

15    there is a typo -- "of any one or more of the receivership

16    entities or as otherwise evidenced by the files of the

17    receivership entities, including without limitation files

18    for matters in which any of the receivership entities was a

19    joint client."

20            Mr. Raissi, do you think there is going to be a

21    dispute about which law firms had joint clients?

22            MR. RAISSI:  Your Honor, I do.  From the papers, I

23    believe there is a dispute as whether or not there was a

24    joint representation with respect to Paul Hastings in the

25    SEC matter as well as Mr. Enayati.

```
 1            As to the other firms, no, I don't believe there

 2   is a dispute as to the existence of a joint representation

 3   and in some instances a lack of a joint representation.

 4            I do agree with Your Honor that, in that clause,

 5   it is very unclear what "as otherwise evidenced by files"

 6   would refer to.

 7            THE COURT:  I don't want to leave something,

 8   frankly, in the discretion of the receiver or his counsel if

 9   it's disputed; not that I don't have enough to do, but I

10   think that may be something that I just have to have a

11   hearing on if there is going to be a dispute as to whether

12   the representation was joint or whether it was Mr. Ross only

13   which, I take it, is the issue.

14            MS. PHELPS:  Your Honor, I don't disagree with

15   that.  I would like to point out, though, in this

16   paragraph B of the order this is simply talking about

17   obtaining client files.

18            So irrespective of whether there was a joint

19   representation or a common interest, if

20   Diversified Lending -- or Direct Lending or any of the

21   receivership entities had an attorney-client relationship

22   client with any law firm, they are entitled to obtain those

23   files.

24            THE COURT:  It's not the law that's in dispute.

25   It's the fact of the relationship.
```

1           MS. PHELPS:  I don't think that anyone disputes

2   that the receivership entities had a relationship with the

3   law firm.  The question is whether Mr. Ross also had a

4   relationship.  And for purposes of this paragraph, that

5   actually is irrelevant because we're not talking about

6   disclosure.  We're talking about obtaining the file, and I

7   think that's an important distinction to keep in mind going

8   through this order.

9           Obtaining the files is the easy question here.  Of

10  course a client is entitled to files.  Whether or not they

11  can waive the privilege and disclose the information, the

12  attorney-client privileged communications, is a separate

13  question where the joint representation comes in --

14          THE COURT:  You are beyond what I'm asking.

15          If I understood, Mr. Raissi, there is a dispute as

16  to which firms had which clients.

17          MS. PHELPS:  No.  Well, I'm not quite sure it goes

18  that far --

19          THE COURT:  Well, if he says, yes, there is a

20  dispute and you say no, then there clear is.

21          MS. PHELPS:  No.  I think we agree on where the

22  dispute is, and that is with respect to whether or not there

23  is joint representation with respect to two different law

24  firms, which is Paul Hastings and Enayati.  Other than that

25  dispute on joint representation, I don't think there is a

1    dispute.

2            THE COURT:  And the dispute is that Mr. Raissi --

3    Mr. Ross, I should say, contends that he was the sole

4    client.  Is that it?  Or the other way around --

5            MR. RAISSI:  Let me clarify that.  With respect to

6    Paul Hastings and Mr. Enayati, counsel has it correct, I

7    believe, in what she was trying to state, and, that is,

8    Direct Lending did have, to my knowledge, at least, an

9    attorney-client relationship with those two firms.

10           Our belief and contention here is that Mr. Ross

11   also had a relationship, an attorney-client relationship,

12   with those two law firms such that there was joint

13   representation with respect to the SEC matter.

14           THE COURT:  Is it only that matter that's in

15   dispute?

16           MR. RAISSI:  No, Your Honor.  There is,

17   unfortunately, about six or seven issues in dispute here.

18   That, however, is one of the important disputes as to

19   whether or not that joint representation issued on

20   Mr. Ross's behalf.

21           THE COURT:  Is there a way to phrase this B that

22   takes the disputes out of it so it's something that I can

23   order and then the disputes can be resolved separately,

24   presumably --

25           MR. RAISSI:  Your Honor, my suggestion on B, if

```
 1    that's what we're talking about, excluding everything else,

 2    if there is an engagement letter that establishes an

 3    attorney-client relationship with Direct Lending, the

 4    receivership entities, I think that is appropriate that they

 5    obtain those files.

 6            And so the only part of that paragraph that has me

 7    scratching that my head is that clause that says "or as

 8    otherwise evidenced by the files of the entities" because I

 9    don't know what that means as far as the establishment of an

10    attorney-client relationship.

11            I understand an engagement letter and agree, yes,

12    that clearly establishes one.  So I would strike that

13    clause, and otherwise it's fine by me.

14            THE COURT:  All right.

15            Miss Phelps.

16            MS. PHELPS:  Your Honor, I suspect for today that

17    that's going to have to do, and I would hope that, to the

18    extent that we do establish that there is an attorney-client

19    relationship with a law firm where we can't locate an

20    engagement letter, that we can communicate with counsel and

21    likely reach an agreement with that.

22            THE COURT:  That I would assume would be neither

23    you nor the firm has an engagement letter, which wouldn't

24    mean there wasn't an attorney-client relationship but --

25            MS. PHELPS:  Correct, Your Honor.  If we can
```

1    establish and everyone feels comfortable that there was an

2    attorney-client relationship, I don't think that anybody

3    disputes that the receiver should be entitled to this file.

4              THE COURT:  I don't think so either.  I will just

5    take that out for now.  And if there is a dispute because

6    you find something that you think applies and you can't work

7    it out with counsel, then, obviously, you can bring it to

8    me.

9              All right.  C.  You want me to say that

10   Brendan Ross is not a client of and, therefore, holds no

11   attorney-client privilege in his individual capacity with

12   regard to any communications with a law firm in which he is

13   not personally identified as the client of such law firm in

14   its engagement agreement.

15             And I take it you dispute that, Mr. Raissi.

16             MR. RAISSI:  That's correct Your Honor, I do.

17             MS. PHELPS:  As I understand the dispute with

18   respect to that provision, it is solely related to

19   Paul Hastings and Mr. Enayati.

20             Is that correct?

21             MR. RAISSI:  That's incorrect.  It would certainly

22   be with Paul Hastings and Mr. Enate in the sense of the

23   joint representation, meaning both DLI and Mr. Ross are

24   clients of both of those firms.

25             In addition -- and we submitted the declaration

1    with the e-mail -- there is a common interest in the joint

2    defense agreement here that is a form of an attorney-client

3    relationship or a privilege at the minimum that includes

4    Paul Hastings; Mr. Enayati, in-house counsel at DLI; and the

5    investment law group.  They're all on the e-mail where

6    they're sharing privileged communications under such a

7    heading.

8             THE COURT:  To the extent there is a joint defense

9    agreement, I don't know whether you don't think there was a

10   joint defense agreement or you don't think that, even if

11   there is, that Mr. Ross has a privilege?

12            MS. PHELPS:  Your Honor, we do not believe that

13   Mr. Ross has established such an agreement.  I do want to

14   preface everything by saying that, if the receiver obtains

15   information from Mr. Ross or otherwise, that there either

16   was joint representation or a common interest.  Of course,

17   the receiver and his current counsel will honor that.  We do

18   not see that as of right now despite Mr. Ross's response to

19   this motion.

20            We would like, if the Court is inclined to limit

21   the issues for right now -- and we would like to reserve our

22   rights, Your Honor, to file another motion or to set an

23   evidentiary hearing on that matter.  We are willing to abide

24   by that for purposes of today, but we don't believe,

25   Your Honor, that Mr. Ross has established that.

```
 1            THE COURT:  Okay.  But do you agree that, if there
 2   was a joint defense agreement, orally or written, that he
 3   would then also hold the privilege?
 4            MS. PHELPS:  If there was such an agreement?
 5   Pursuant to under California Evidence Code Section 962, the
 6   right of either party to disclose information with the
 7   agreement of the others, yes, I do agree.
 8            THE COURT:  So if I just change that so that it's
 9   "wasn't a client of and wasn't participating in a joint
10   defense agreement" or words to that effect, would that
11   resolve it for this, at this point in time?
12            MS. PHELPS:  It would, Your Honor, so long as --
13   we may want to make express in the order that the receiver
14   is reserving his rights to challenge the assertion of such a
15   joint representation --
16            THE COURT:  It's not making any finding.  So, of
17   course, he reserves his right.
18            MR. RAISSI:  If I might, I just want to be clear
19   that, with respect to this paragraph, there are two separate
20   concepts that give rise to the privilege, and that is joint
21   representation and common.  So if there is a qualifier on
22   that paragraph, it would need to include both concepts.
23            And as far as reserving rights, they brought this
24   motion.  They put this at issue.  I don't know what we're
25   reserving rights for.
```

```
1              THE COURT:  I don't know.  I'm sure I stuck that

2    in everything I wrote when I was a lawyer, but I can't tell

3    you how annoying it is that everybody thinks they need to

4    tell me they are going to reserve their rights because, if

5    they don't have any rights, they can't reserve them and, if

6    they do, they're already reserved.  But that having been

7    said, you can come back and make more motions any time.

8              So I am going to have you, Mr. Raissi, propose

9    some language -- well, I think I will just have an amended

10   order, proposed order, submitted after the two of you meet

11   and confer.  And if you can't agree on language, then give

12   me your separate comments.

13             So D, "the receiver is authorized to review client

14   files and attorney-client communications in the which there

15   is joint representation," you don't have any problem with

16   that, do you, Mr. Raissi?

17             MR. RAISSI:  Sorry to be the difficult one here,

18   Your Honor, but I do because one of the subsets of what I

19   think is covered, at least in our view, by a joint

20   representation is Mr. Ross's personal e-mail that was in his

21   Gmail account that he gave access to the lawyers at the

22   Kasowitz firm to basically vacuum out of his Gmail account.

23             With respect to those personal e-mails, we do not

24   believe that it's appropriate for the receiver to have

25   access to them inasmuch as they're on a topic other than the
```

1     topic of the joint representation with the Kasowitz firm.

2          And the reason for that is he turned those over to

3     his lawyers that -- by an agreement.  An engagement

4     agreement in writing represented him, and he turned them

5     over to his lawyers understanding it was confidential.  So

6     he didn't pull out other privileged e-mails that have

7     nothing to do with the matter of the representation with the

8     Kasowitz firm, out of that e-mail.

9          THE COURT:  This is covered by the same issue

10    about whether he has a right to keep things confidential

11    that are in his phone or on the --

12         MS. PHELPS:  It is not, Your Honor.  It's

13    different because this he turned over to his personal

14    lawyers.  He never put it on the DLI computer system.

15    That's not an action he took.  He gave it to his lawyers.

16         And it included things that are privileged for

17    completely other reasons.  And the way the law works with a

18    joint representation is communications about the subject of

19    a joint representation are shared with the other side, and

20    that's the law.

21         Personal communications are communications that

22    have nothing to do with it are not subject to the sharing

23    concept.

24         THE COURT:  Well, where was it, though?  Was it on

25    his phone?

```
1              MR. RAISSI:  No.  It was a Gmail account,
2    Your Honor, just like, when you log in on any computer --
3              THE COURT:  Was that the on DLI's computer?
4              MR. RAISSI:  No.  So Gmail existed -- Google.
5    Google actually has it.  And so Google, on their servers,
6    have all his personal e-mail.  I have a Gmail account too,
7    and that's where it lives.  What he did was gave his lawyers
8    the ability to log in to his account.
9              THE COURT:  To the Gmail account.
10             MR. RAISSI:  Correct, Your Honor.
11             THE COURT:  Which is not --
12             MR. RAISSI:  Not on DLI.  You can access it from
13   any physical computer, but it doesn't reside anywhere other
14   than on Google.
15             THE COURT:  Miss Phelps, what's your response to
16   that?
17             MS. PHELPS:  Your Honor, counsel has just
18   previously finished asserting that Mr. Ross asserts a common
19   interest defense and joint representation with the Kasowitz
20   firm.  And this was information provided to the Kasowitz
21   firm in connection with a response to the SEC investigation
22   against issues relating to DLI.
23             Having said that, the receiver has no interest in
24   reviewing Mr. Ross's attorney-client privileged
25   communication with his own personal lawyer, which we
```

1    understand to be the WilmerHale firm.

2            And to the extent that Mr. Ross wants to provide

3    us with the names of any other personal attorneys where

4    there is no joint representation or common interest, we are

5    happy to conduct a search and to decline -- to segregate

6    those communications and to not review them.

7            THE COURT:  You're happy to conduct a search?  Or

8    conducting a search?

9            MS. PHELPS:  Information is presently on the DLI

10   server.  We can conduct a search --

11           THE COURT:  How did it get on the DLI server?

12           MS. PHELPS:  How did they get on the --

13           THE COURT:  I know it's in here but --

14           MS. PHELPS:  In one of two ways.  Either from

15   Mr. Ross giving it to the Kasowitz firm --

16           THE COURT:  And then Kasowitz gave it --

17           MS. PHELPS:  And Kasowitz gave it.  Or I

18   understand he also put some of them directly on the server.

19           MR. RAISSI:  No, that's not true, Your Honor.  The

20   way it happened is the Kasowitz firm turned it over to DLI

21   because they were representing DLI at the same time as well,

22   and DLI on its own put it on its own server so it could do

23   whatever it wanted to do with the e-mail.

24           Mr. Ross had nothing to do with putting it on

25   DLI's system.  However, they do have a copy of it.

 1          MS. PHELPS:  So, again, Your Honor, it is on the

 2   server, and we are perfectly fine and think it's appropriate

 3   for us to not review attorney-client privileged

 4   communication between Mr. Ross and his attorneys.  If

 5   Mr. Ross provides us with the names of those attorneys, we

 6   can carve those out and not review those.

 7          MR. RAISSI:  Your Honor, from my point of view,

 8   that's backwards because what the law says is that they're

 9   only entitled to communications about the subject matter of

10   the joint representation.  Fine.

11          However, the vast majority of what's in his

12   personal e-mail account is his personal financial matters,

13   communications with his wife, which is entitled to a spousal

14   privilege, certainly communications with his independent

15   lawyers.  The vast majority has nothing to do with the

16   subject --

17          THE COURT:  Why has he given those to some lawyers

18   to stick on --

19          MR. RAISSI:  The reason they did it, there was a

20   question of whether he had any information about a topic,

21   and what he said is, "Okay.  You are the lawyers.  You

22   understand the topic.  You go see if in there is anything at

23   all about that topic in my e-mail.  You are my lawyers.

24   There is a confidence here.  I can give them to you to

25   verify that I don't have any information."  There is --

```
 1              THE COURT:  So they thought it was okay to give it

 2    to DLI?

 3              MR. RAISSI:  Well, DLI was a co-client at the time

 4    pursuant to an engagement agreement.  I can't speak for that

 5    firm as to why they did it or didn't do that.

 6              THE COURT:  On that I might have to have a hearing

 7    and resolve it myself because it sounds kind of tortured,

 8    although I do think that it's not the receivers.

 9              I don't know how you -- you're looking at it to

10    decide whether it's something you shouldn't be looking at.

11    That doesn't really make any sense.

12              MS. PHELPS:  You run a search on the names of the

13    law firms on which they assert that there are

14    attorney-client privileged communications.

15              THE COURT:  For Kasowitz, you are going to come up

16    with both; right?

17              MS. PHELPS:  There is a common interest defense

18    that we would be entitled to --

19              THE COURT:  He is saying you are not.

20              MS. PHELPS:  I heard that a little differently.

21              MR. RAISSI:  I don't think I spoke to any e-mail

22    of Kasowitz.  Certainly e-mail with his wife, for example,

23    or about his health issues I don't think is any of their

24    business.

25              THE COURT:  Did that come from Kasowitz or
```

1   somewhere else?

2           MR. RAISSI:  It would have come from Kasowitz --

3           THE COURT:  That's what I thought.  So it's not

4   really going to completely help because you are not going to

5   just search for Kasowitz because you are going to come up

6   with what he claims, then, is both joint representation and

7   non-joint representation information.

8           MR. RAISSI:  Your Honor, there may be a way to

9   skin this cat.  And if we were able to agree or the Court

10  ordered that communications about the subject of the joint

11  representation with Kasowitz are appropriate for them to

12  have under the joint representation concept, we may be able

13  to come up with a search term or two that would satisfy that

14  because it's very identifiable subjects.

15          There is this Talking Capital Litigation and

16  something called VoIP.  So it wouldn't be too hard to find

17  those two subjects.

18          THE COURT:  Good.  Well, then you should do that.

19          MS. PHELPS:  We think it's much broader than that

20  because we do know Mr. Ross was using his personal accounts

21  to e-mail the counterparties, and that is information that

22  should have been stored on the DLI.  So it's far broader

23  than that.

24          THE COURT:  Why don't you talk about it and see if

25  you can come up with something?  Otherwise put whatever you

```
 1    can agree to in a proposed order, and you can let me know
 2    separately what's not agreed to so I can figure out whether
 3    or not I have to have a hearing and make the decision.
 4            All right.  E, starts off with "Except as
 5    otherwise provided under applicable law, including without
 6    limitation Evidence Code Section 962 and applicable federal
 7    law" -- I don't know if you have a concern about that
 8    phrase, Mr. Raissi.
 9            MR. RAISSI:  I'm not sure why we're citing
10    California Evidence Code here.  I think what they mean to
11    say is except as, sort of, allowed by the law of joint
12    representation or joint defense agreements, et cetera,
13    et cetera.
14            MS. PHELPS:  That is what the California
15    Evidence Code relates to.
16            MR. RAISSI:  I think it only relates to joint
17    presentations.
18            MS. PHELPS:  Okay.
19            THE COURT:  Why don't you work on that.
20            MS. PHELPS:  Otherwise, I think that language
21    provides that we're going to follow the law and not disclose
22    or waive privilege to the extent not permitted to law where
23    there is a joint representation.
24            MR. RAISSI:  That's my understanding of what
25    they're trying to accomplish with than language.
```

```
1         THE COURT:  Mine too.  I just want to make sure
2   that you are comfortable because, based on that language,
3   the receiver is deciding what's appropriate.
4         MR. RAISSI:  No.  That's why we are in front of
5   Your Honor because we have a dispute over what relationships
6   and what communications are subject to a privilege.
7         THE COURT:  Yes.  So that first phrase has to come
8   out because, if there is an issue at some point, then either
9   you will agree that, yes, this is -- disclosure's
10  appropriate under federal or state law or you won't.  And if
11  you won't, then I am going to have to decide it.  But as
12  phrased, this suggests that the receiver would be the
13  decision maker, and I don't think that's what --
14        MR. RAISSI:  No.  And I will -- look.  This isn't
15  my language.  I wouldn't have written it this way.  And if
16  Your Honor wants to order us to meet and confer on the
17  language, we certainly can.
18        I have read this to say that first clause I think
19  is meant to capture the concept that, under a joint
20  representation and under a joint defense agreement, both
21  sides do have access to and concede the communications.
22  However as to the rest of the world, they remain privileged
23  and neither side can waiving anything.
24        MS. PHELPS:  Right.  That's my understanding as
25  well.
```

```
1              THE COURT:  If you both like the language, it's
2    fine with me.  If you don't, then you need to work on it.
3    If you can't agree, as I said, I will decide.
4              All right.  Then, obviously, we have a problem
5    with F.
6              MR. RAISSI:  Correct, Your Honor.
7              THE COURT:  So why don't you tell me some more
8    about that because I don't completely understand what's
9    going on with Robin Hill and all this -- how this other
10   stuff got there and what Robin Hill and these other
11   allegedly dual employees were doing.
12             MS. PHELPS:  Your Honor, Mr. Ross, knowing the
13   policies of DLI, probably having had a large hand in
14   developing the employee handbook, knowing who purchased his
15   phone, knowing how information was stored on the DLI
16   servers, elected to use and store his information on the DLI
17   servers.  There is no question, when you look at the
18   documents, the corporate documents from DLI, that that type
19   of information is property of DLI.
20             And Your Honor's order appointing a receiver
21   expressly directed him to take possession and to utilize
22   that information and that property to administer
23   receivership estate.
24             What Mr. Ross has asserted in his opposition is
25   that some of his businesses, the Robin Hill businesses, for
```

1  whatever reason, he elected to store that information on a

2  DLI server.  It was accessible to at least some of the DLI

3  employees who also happened to be Robin Hill employees.

4       What he says is, "Oh, had I known that I was going

5  to leave suddenly, I would have deleted everything from the

6  DLI server" --

7       THE COURT:  And taken $2 million, apparently.

8       MS. PHELPS:  So that's concerning, Your Honor.

9  That's not a matter of keeping his personal records

10  personal.  That's a matter of deleting property in DLI when

11  the SEC had an active investigation pending against DLI, and

12  that's concerning.  So because that is property of DLI

13  stored on DLI's servers and this concept of a root file is

14  simply a separate file with -- labeled with Robin Hill on

15  the DLI servers on -- stored in the loud or elsewhere, we

16  don't believe that there was any expectation of privacy or

17  confidentiality in those records because they were just

18  right there and for viewing by some of the DLI employees.

19       So we believe that everything that's stored on the

20  DLI servers -- and I understand Your Honor's concern about

21  the Gmail account which we will separately talk about.  But

22  other than that, which we've accepted for purposes of today,

23  we believe that is all property of DLI and that the receiver

24  should have access to that.

25       THE COURT:  Mr. Raissi.

```
 1              MR. RAISSI:  That's clearly not our view.  Let me
 2   be clear what we're talking about here.  There are several
 3   different categories under this umbrella for this particular
 4   paragraph.  It would include regular e-mail at DLI through
 5   the DLI system, but it also includes what is personal
 6   property of Mr. Ross, and there are three categories there.
 7              Number one are his personal files, tax files,
 8   financial files, where he stored his own electronic records.
 9              The other two are -- there are two different
10   Robin Hill entities -- Robin Hill Services and Robin Hill
11   Investments.
12              And the background on that is that Mr. Ross and
13   the company, I guess, but Mr. Ross set up those separate
14   files back before DLI was even registered with the SEC back
15   before the employee handbook that's at issue here even
16   existed.
17              When he first started the company, he, as the
18   administrator of the system, set up separate files that only
19   he could see.  Nobody could even see they existed, and
20   they're not on a server physically at DLI.  They are just
21   stored off in the cloud somewhere.
22              As the firm grew and it transitioned to a
23   different but essentially the same information system, he
24   maintained the separateness of his personal files and the
25   Robin Hill entity.
```

 1          They are not commingled, and a root file -- you

 2    can trivialize it, but it's a real concept -- which means,

 3    look.  If you think in terms of a file cabinet or a file

 4    room, there is a file room over there, DLI, and that's one

 5    way you store it up into the cloud and then over here

 6    completely separately are Mr. Ross's files.

 7          And technologically that's a distinction.  There

 8    is a divide there.  His personal files were over on the left

 9    side, not on the right side with DLI's.  And, again, these

10    files were not even visible to DLI employees except, of

11    course, the people who administer the system.

12          And by definition, every system administrator can

13    see and look at all files.  Therefore, there would never be

14    confidentiality if that was some sort of an impediment.  And

15    in the Asia Global Crossing case which is cited by both

16    sides, the Court in fact makes that point, and that is the

17    fact that administrators can access or see a file doesn't

18    mean anything because by definition they can always do that

19    for all files.

20          So in this case, we have separate files that are

21    not visible to DLI where Mr. Ross stored his personal

22    information.  DLI has no claim of ownership over his tax

23    records, for example; and things like that are confidential

24    and personal to him.  And over time as the company grew,

25    there was one employee who was an employee of both

1    Robin Hill and DLI and acting in her capacity as a

2    Robin Hill employee, being paid by Robin Hill.

3          She was Mr. Ross's personal assistant for his

4    personal things like paying credit cards and all of that.

5    And she was the only person who had access to his personal

6    files, only one person and when -- employed by a different

7    entity.

8          As to the Robin Hill entity, it is largely the

9    same although there were I think three employees who were

10   Robin Hill employees but also DLI employees paid by

11   Robin Hill, paid by DLI, who had access to those files to

12   work on those matters.

13         With respect to Robin Hill, our position is, look.

14   There is one entity, Robin Hill Services, that has a

15   contract with DLI to maintain some records and do some

16   business and has a contractual obligation to provide access

17   to DLI for some records.  And as to those, the contract is

18   the contract and DLI can have access to it.

19         But as to the other records that pertain solely to

20   Robin Hill those belong to Robin Hill, not to DLI.  And as

21   to Robin Hill Investments, there was no access to anybody

22   there.  That's just purely a separate third entity much like

23   Mr. Ross's personal files.

24         So the way this was set up, the way that it works,

25   it is not something that was commingled.  It was not

```
 1    something they had access to.  And the receiver, of
 2    course -- the only basis for saying there is a property
 3    right -- in other words, the receiver owns those files is
 4    the employee handbook and the Court's receivership order.
 5              And with all due respect, I don't think the order
 6    appointing the receiver can convert one person's property
 7    legally into another person's property.
 8              Similarly, the employee handbook can't convert one
 9    person's property into another person's property.
10              When it comes to the handbook, let's be very clear
11    also that it's clear in the handbook because it says so
12    under the heading "Company access to technology resources,
13    no reasonable expectation of privacy."
14              In that very paragraph, it has a super important
15    caveat here.  And it says, "Nobody other than the company's
16    CEO," which is Mr. Ross, "has the authority to waive, vary,
17    or amend DLI's access to its technology resources."
18              So the policy that they say gave up his ownership
19    interests specifically allows Mr. Ross to except himself or
20    anyone else from its requirements, which is exactly what he
21    did when he set up the separate files that were not
22    commingled with DLI and accessible only to him and one other
23    employee.
24              And so the handbook -- and there are a bunch of
25    certifications where he says he's going to abide by the
```

1  handbook's provisions, that's circular logic.  All he's

2  saying is, yeah.  I'm going to abide by this, and this

3  allows me to do what I did from the beginning of the company

4  moving forward.

5       So our position as to those files is that they are

6  not receivership property pure and simple.  It's a matter of

7  property rights.  And so, therefore, they have no access or

8  right to them, and in fact they should be returned.

9       And what we have in those files, in particular his

10  personal files, are protected personal information, the kind

11  of thing that, but for a heightened showing of need even in

12  discovery, nobody is entitled to.  And what we have said is,

13  look.  Those need to come back to him and --

14       THE COURT:  When you say come back to him, you

15  mean they need to be deleted?  Or does he actually not have

16  access to them some other way and --

17       MR. RAISSI:  He does not have access to these.

18  No, he has no access to these folders or whatever they may

19  be.

20       And it's a matter of possession.  The receiver

21  should not be in possession of these files.  And if through

22  ordinary discovery they think some aspect of them is

23  appropriate, that's fine.

24       And we've analogized this to personal property on

25  someone's desk like his family photos, and the receiver

 1   analogizes it to a memory stick left in the drawer saying

 2   it's not like that at all.  Actually, it's exactly like

 3   that.  That's our point.  This was a memory stick that he

 4   left in his drawer, and it's his.

 5          And there is a couple of cases we cited that stand

 6   for the proposition that, well, if that's someone else's

 7   property, it comes back.

 8          Also the Mendlowitz case is pretty important here

 9   because it stands for the proposition, even if one were to

10   think that the handbook applies, the founder and CEO of a

11   company stand in a very different position than an ordinary

12   employee when it comes to these kinds of policies.

13          And we've shown there are a number of other

14   policies in the handbook that were not even applied to

15   Mr. Ross, demonstrating that these provisions were never

16   intended to apply to him.

17          And likewise, if you make fun of the $2 million --

18   but that's a fact.  That was his money.  And when he was

19   asked to step aside voluntarily -- nobody could force him to

20   do that.  He did that and said, "I am going to leave

21   everything exactly like it is because that's the right thing

22   to do."

23          But for his personal files for example, they're

24   his.  He had every right to say, "Just like my family

25   photo -- okay, I will leave, but I'm going to go take my

1  family photo."  Right?  And he didn't do that because he

2  thought, okay.  Just better to step aside.

3        Nobody had anticipation that there was a

4  receivership coming or anything like that.  It was there was

5  an issue that needs to be sorted out.  Let makes sure it's

6  done the right way.

7        In the Asia Global case, again, the same issue

8  there, that some employees were asked to leave suddenly,

9  like, that day -- "You need to leave" -- and the bankruptcy

10  trustee in that case was saying, "They've waived it because

11  they walked away from it," and the Court said no.

12        When somebody is asked to leave suddenly and they

13  don't gather their personal things, they don't lose their

14  right to their personal things.  You can't hold that against

15  them.  That's where we come out on this as well, Your Honor.

16  He owns those.  He should have them back.

17        THE COURT:  All right.

18        And then G.  Obviously, you have an objection to

19  this as well, Mr. Raissi.

20        MR. RAISSI:  Correct.  I think it's the same

21  issue.

22        THE COURT:  All right.  Well, the one I still have

23  concern about, obviously, is the one that's related to his

24  personal property as he describes it and the Robin Hill

25  stuff.  So I will continue to ponder that, and each is fine,

1    and the two of you should get together and try to come up

2    with some agreeable language for the remaining items and

3    submit that to me.  And if you can't, then provide two

4    different -- for any one you can't agree to provide two

5    different proposals, and I will decide which, if either, I

6    will put in an order.

7              Anything else I can do for you today?

8              MR. RAISSI:  Well, Your Honor, to state the

9    obvious, maybe -- we'll, of course, come up with either

10   competing or a joint proposed order.

11             It, of course, begs the question of whether or not

12   there was a common interest joint defense agreement here and

13   begs the question whether there was joint representation

14   with respect to the law firms where we say there was, and so

15   I'm not sure what we can do to help resolve that issue or if

16   Your Honor plans to resolve them and then use our language

17   that we are proposing.

18             THE COURT:  Well, I want you to see if you can

19   agree on language.  But to the extent that there are two law

20   firms or specific issues, I think I am going to have to have

21   actual hearings.

22             I don't think I can do it without hearing from law

23   firms and seeing more documentation, some of which I'm not

24   sure that you even have yet or maybe you are not sure

25   whether you can find it.  So I think this is all subject, to

1    the extent that you don't agree on specifics, to my,

2    unfortunately, having to have a hearing because I don't

3    think there is any other way to do it.

4             MS. PHELPS:  Your Honor, your comments have been

5    very helpful.  The parties have exchanged a few term sheets

6    in an attempt to narrow or resolve the issues as recently as

7    yesterday, and I actually think I would like to take one

8    more pass at seeing if we can reach agreement which might

9    simply kick the can down the road on a few of these issues.

10            So let us take an opportunity to do that and see

11   if we can agree.  And, if we can't, we'll advise the Court.

12   We'll file, hopefully, one joint order and if not competing

13   orders maybe with declarations and wait for your ruling.

14            THE COURT:  Certainly with regard to waiver, there

15   won't be any waiver until I hear further or you agree as to

16   what specifically is being waived.  But that may not be the

17   only issue that's being kicked down the road.

18            MS. PHELPS:  Thank you very much for your time.

19            THE COURT:  All right.

20            MR. RAISSI:  Thank you, Your Honor.

21            THE COURT:  Thank you.

22        (Proceedings concluded at 2:08 P.M.)

23                       --oOo--

24

25

```
 1                        CERTIFICATE

 2

 3        I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported

 6   proceedings held in the above-entitled matter and that the

 7   transcript page format is in conformance with the

 8   regulations of the Judicial Conference of the United States.

 9

10   Date:  October 9, 2019.

11

12

13

14                   __/S/ CHIA MEI JUI _____

15                   Chia Mei Jui, CSR No. 3287

16

17

18

19

20

21

22

23

24

25
```