KATHY BAZOIAN PHELPS (155564)
*kphelps@diamondmccarthy.com*
DIAMOND MCCARTHY LLP
1999 Avenue of the Stars, Suite 1100
Los Angeles, California 90067-4402
Telephone: (310) 651-2997

CHRISTOPHER D. SULLIVAN (148083)
*csullivan@diamondmccarthy.com*
STACEY L. PRATT (124892)
*stacey.pratt@diamondmccarthy.com*
DIAMOND MCCARTHY LLP
150 California Street, Suite 2200
San Francisco, CA 94111
Phone: (415) 692-5200

*Counsel for Bradley D. Sharp,*
*Permanent Receiver*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION – LOS ANGELES

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>DIRECT LENDING INVESTMENTS LLC,<br><br>Defendant. | Case No. 2:19−cv−02188−DSF−MRW<br>Hon. Dale S. Fischer<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF RECEIVER FOR:**<br><br>**(1) APPROVAL OF CLAIMS STIPULATION WITH DLIFF JOINT LIQUIDATOR; AND**<br><br>**(2) AUTHORITY TO MAKE INTERIM DISTRIBUTION TO DLIFF** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Date:    December 21, 2020
Time:    1:30 p.m.
Dept.:   Courtroom 7D
Place:   United States District Court
         Western Division
350 West 1st Street,
Los Angeles, CA 90012

## TABLE OF CONTENTS

I.      Introduction ..........................................................................................1

II.     Background ...........................................................................................2

III.    The Claims Stipulation .......................................................................6

IV.     Summary of Distribution Plan ...........................................................7

V.      The Claims Stipulation is in the Best Interest of the Estate.........................9

Vi.     Notice Of The Hearing On This Motion Should Be Deemed
        Appropriate And Sufficient.................................................................15

VII.    CONCLUSION ...................................................................................16

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF RECEIVER FOR:
(1) APPROVAL OF CLAIMS STIPULATION WITH DLIFF JOINT LIQUIDATOR; AND
(2) AUTHORITY TO MAKE INTERIM DISTRIBUTION TO DLIFF

# **TABLE OF AUTHORITIES**

## **Cases**

*Bennett v. Williams,*
  892 F.2d 822, 824 (9th Cir. 1989) ...................................................................11

*Gordon v. Dadante,*
  336 F. App'x 540 (6th Cir. 2009) .....................................................................9

*In re First Alliance Mortgage Co.,*
  269 B.R. 428 (C.D. Cal. 2001) ........................................................................15

*In re Thinking Machines Corp.,*
  182 B.R. 365 (D. Mass. 1995) .........................................................................11

*Janvey v. Alquire,*
  No. 3:09-cv-0724, 2014 WL 12654910 at *17 (N.D. Tex. July 30, 2014. ..........10

*Richie Capital Mgmt., v. Kelley,*
  785 F.3d 273 (8th Cir. 2015.) ...........................................................................9

*SEC v. Hardy,*
  803 F.2d 1034 (9th Cir. 1986) .........................................................................9

*Sec. & Exch. Comm'n v. Ruderman,*
  No. CV 09-02974, 2011 WL 5857452, at *3 (C.D. Cal. Nov. 21, 2011) ......10, 12

*Securities and Exchange Commission v. Path America, LLC,*
  2016 WL 3865919 *3 (W.D. Wash. July 15, 2016)......................................11, 12

*Southwestern Media, Inc. v. Rau,*
  708 F.2d 419 (9th Cir. 1983) ...........................................................................11

*United States v. Edwards,*
  595 F.3d 1004 (9th Cir. 2010) .........................................................................10

## **Statues and Rules**

11 U.S.C. § 102(1)(A) .......................................................................................16

F.R. Civ. P. 5 (c) ...............................................................................................15

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF RECEIVER FOR:
(1) APPROVAL OF CLAIMS STIPULATION WITH DLIFF JOINT LIQUIDATOR; AND
(2) AUTHORITY TO MAKE INTERIM DISTRIBUTION TO DLIFF

F.R. Civ. P. 5(a) ........................................................................................................15

Local Civil Rule 66-8 ................................................................................................15

**Statutes and Rules**

Internal Revenue Service Reg. §1.468B-2(k)(2) ........................................................3

Treasury Regulation § 1.468B(1)(c) ..........................................................................3

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF RECEIVER FOR:
(1) APPROVAL OF CLAIMS STIPULATION WITH DLIFF JOINT LIQUIDATOR; AND
(2) AUTHORITY TO MAKE INTERIM DISTRIBUTION TO DLIFF

Bradley D. Sharp, the Court-appointed permanent receiver (the "Receiver") for the estate of Direct Lending Investments, LLC ("DLI"), Direct Lending Income Fund, L.P., ("DLIF"), Direct Lending Income Feeder Fund, Ltd. ("DLIFF" and together with DLIF, the "Feeder Funds"), DLI Capital, Inc., DLI Lending Agent, LLC, DLI Assets Bravo LLC, and their successors, subsidiaries and affiliated entities (collectively, the "Receivership Entities") pursuant to the Preliminary Injunction Order and Order Appointing Permanent Receiver issued April 1, 2019 ("Receiver Order") (Doc. No. 10), hereby files his Motion for: (1) Approval of Claims Stipulation with DLIFF Joint Liquidator, and (2) Authority to Make Interim Distribution to DLIFF(the "Motion").

## I.      Introduction

The Receiver has conducted a thorough evaluation of the pre-Receivership activities in this case are set forth in detail in the Report Regarding the Investigation of the Receivership Entities' Business Conduct and Recommendations Regarding Distributions dated November 13, 2020 (the "Receiver's Report").

Pursuant to this Court's Order dated April 9, 2020 [Dkt. No. 251] (the "Bar Date Order"), the Receiver has run a thorough claims process and has undertaken a review of the claims submitted and the impact of different distribution models on the creditor body to assist him in fashioning a distribution plan in this case that is equitable under the circumstances. The Bar Date Order required all third-party claimants of all Receivership Entities to file claims with the Receiver. However, the Bar Date Order does not require intercompany claims between and amount the Receivership Entities to have been filed.[1] The following classes of Claimants have asserted claims against the Receivership Estate: Administrative Claims; Priority Claims; the claim of the joint liquidators of DLIFF;  DLIF Investors; and Creditor Claims. The motion to approve the Distribution Plan has been filed concurrently

---

[1] See Bar Date Order ¶ 5.

herewith.  The Plan recommends a priority of distributions from the funds in the receivership estate to the following classes of claimants in the following priority: Administrative Claims (Class 1); Priority Claims (Class 2); DLIFF (Class 3) to be shared on a *pro rata* basis with the claim of DLIF, with the proceeds of the DLIF claim to be distributed to DLIF Administrative Claims (Class 4A) and DLIF Investors (Class 4B); Unsecured Creditor Claims (Class 5); Indemnity Claims (Class 6); and Counterparty Claims (Class 7).

Class 3 consists solely of the claim relating to DLIFF, which is in an official liquidation proceeding in the Cayman Islands. The Plan proposes a ratable distribution as between the joint liquidators of DLIFF (Class 3), on the one hand, and DLIF Administrative Claims (Class 4A) and DLIF Investors (Class 4B), on the other hand, based upon the allocation agreed to pursuant to the terms of that certain Claims Allowance Stipulation, a copy of which is attached to the Declaration of Bradley Sharp as Exhibit "1" (the "Claims Stipulation").

This Motion seeks approval of the Claims Stipulation and also seeks authority to make an interim distribution to DLIFF in the amount of $ 10 million from the collateral of DLIF and DLIFF ("DLIFF Interim Distribution").[2]

## II.    Background

The SEC filed a complaint against DLI on March 22, 2019, alleging fraud by DLI in violation of various federal securities law, including Sections 206(1) and 206(s) of the Advisors Act, Section 10(b) of the Exchange Act and Rule 10(b)(6), and Section 17(a) of the Securities Act, and Section 207 of the Advisers Act (the

---

[2] The amount distributed to DLIFF may be materially higher if the Receiver's Distribution Plan is approved concurrently with this Motion and he is authorized to make his proposed interim distribution pursuant to the terms of the Plan. If approval of the proposed Plan is delayed or disallowed, the Receiver nevertheless proposes to pay from the secured collateral the DLIFF Interim Distribution and to also reserve DLIF's *pro rata* share of the collateral, or $22,730,414, to ensure that a ratable amount of the collateral is preserved for DLIF investors pending approval of the Distribution Plan.

2

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF RECEIVER FOR:
(1) APPROVAL OF CLAIMS STIPULATION WITH DLIFF JOINT LIQUIDATOR; AND
(2) AUTHORITY TO MAKE INTERIM DISTRIBUTION TO DLIFF

"Complaint").

The Receiver was appointed as receiver over the Receivership Entities by order entered on April 1, 2019. A qualified settlement fund ("QSF") was established as of the date the Receivership by operation of law pursuant to Internal Revenue Service Reg. §1.468B-2(k)(2)  on the date of commencement of the Receivership, or April 1, 2019, and the Receiver has filed a QSF tax return for the Receivership stub period of April 1, 2019 through December 31, 2019, consistent with the provisions of Treasury Regulation § 1.468B(1)(c) and based on his understanding that criteria mandating the establishment of a QSF were present in the Receivership Case.

DLIFF, a Cayman Islands exempted company incorporated on June 15 2016, is the offshore investment entity that solicited overseas investor funds. Prior to a restructuring of the fund structure managed by DLI in October 2016, all domestic and foreign investors invested through DLIF, which then invested its funds in DLI Assets Bravo LLC ("DLIAB"), and DLI Assets ("DLIA").  In October 2016, DLI moved to a two-feeder fund structure with the formation of DLIFF, the offshore fund, along with DLIF serving as the onshore fund. DLI Capital acted as the Master Fund, through which investor funds raised by DLIF and DLIFF were contributed and deployed. DLI formed DLIFF to solicit investments from non-United States investors. The funds invested by the Feeder Funds were contributed by DLI Capital to its wholly owned subsidiary DLIA, and later to DLIAB, another subsidiary. These funds were ultimately loaned to putative third-party borrowers and the third party borrowers in turn were generally lenders which made loans or extensions of credit to others (the "subsequent loans").

The debt capital contributed under the new structure was formalized in two Loan and Security Agreements each dated as of October 1, 2016 ("LSA"), one with DLIF as lender and one with DLIFF as lender, and with Millennium Trust Company, LLC as the custodian for the benefit of each of the lenders.  Under each of the LSAs,

the Feeder Funds agreed to lend money to DLI Capital as borrower under a revolving loan facility.  DLI Capital contributed the funds loaned as equity capital to two subsidiaries DLI Assets and DLIAB, and those entities made loans to third party borrowers (the "subsequent loans" referred to above) generally on a secured basis. The LSAs by their terms granted DLIF and DLIFF security interests in the loans and equity investments made by DLI Capital.  The collateral for the loans under the LSAs is described as all the "Collateral Assets" of DLI Capital, including all the loans made and collateral received by DLI Capital, along with DLI Capital's ownership interests in any subsidiaries, funds in a control deposit account for the deposit of the underlying loan payments received by DLI Capital, and all other assets of DLI Capital.

DLIF and DLIFF also entered into an Intercreditor Agreement dated as of September 30, 2016, which provided for the lenders DLIF and DLIFF to have *pari passu* rights in the loans made to DLI Capital. The *pari passu* rights were stated to extend to the notes in favor of DLIF and DLIFF by DLI Capital, the collateral for the notes, and all payments and collections or proceeds of enforcement of the loans received by either DLIF or DLIFF.

Shortly after his appointment, the Receiver, on behalf of DLI Capital, passed a unanimous written resolution to place DLIFF into voluntary liquidation under the applicable laws of the Cayman Islands, subject to court approval which was granted. The voluntary liquidators subsequently filed an application by way of a petition in the Grand Court of the Cayman Islands (the "Cayman Court") for the liquidation to continue under the supervision of the Cayman Court. On July 25, 2019, the Cayman Court entered a Supervision Order converting the voluntary liquidation to an official liquidation, and appointing Bradley D. Sharp and Christopher D. Johnson of Chris Johnson Associates Ltd. as the Joint Official Liquidators ("JOLs") of DLIFF.

On August 22, 2019, the JOLs sent a notice to the creditors and shareholders of DLIFF of a meeting of creditors and contributories.  Creditors wishing to attend the meeting were asked to submit a proof of debt form to the JOLs in advance of the meeting.  All claims against and interests in DLIFF are to be pursued directly in the Cayman Islands liquidation proceedings, in accordance with the laws of the Cayman Islands, including without limitation, Order 16 of the Companies Winding Up Rules 2018 and the Companies Law (2020 Revision) applicable to liquidation proceedings in that jurisdiction.

The Receiver, in his capacity as U.S. Joint Official Liquidator in the Cayman Proceeding, and the Cayman JOL, Christopher D. Johnson (the "Cayman JOL"), agreed to a conflict resolution protocol (the "Protocol") that was submitted to the Cayman Court and was approved by that court on July 16, 2020.  This Court subsequently also approved the Protocol.  (Doc No. 293).  The Protocol addressed potential conflict that might arise between the two proceedings, including allocation of the claim amounts as between DLIFF and DLIF. The Claims Stipulation was negotiated pursuant to the Protocol. The Receiver acted on behalf of DLIF in negotiating the Claims Stipulation; the Cayman JOL acted on behalf of DLIFF.

Since approval of the Protocol, the Receiver and Mr. Johnson have negotiated the Claims Stipulation for which the Receiver seeks approval through this Motion.  The primary purpose of the Claims Stipulation is to fix the relative allocation of proceeds to be paid under the Distribution Plan between Class 3 and Class 4.  As contemplated by the Protocol, Mr. Johnson negotiated the terms of the Claim Stipulation on behalf of DLIFF (Class 3) and the Receiver negotiated on behalf of DLIF (Class 4).

In addition to fixing claims as between Class 3 and Class 4, the Claims Stipulation requests authority for the Receiver to make an interim distribution of $10 million to the JOLs of DLIFF.  The Receiver makes this request to ensure that the claims administration process that is running in parallel for DLIFF in the Cayman Islands is not

disrupted if there is delay or litigation over the distribution methodology proposed by the Receiver for creditors and investors of DLIF (as discussed elsewhere, a proposed Rising Tide methodology).  Based upon the cash the Receiver currently holds (approximately $200 million) and the relative allocation as between Class 3 and Class 4 (31% and 69% respectively), the amount of the interim distribution is sufficiently small that it will not under any scenario prejudice the rights of Class 4, regardless of the ultimate method of distribution approved by this Court. The Receiver proposes to reserve a matching *pro rata* amount Class 4 (the "DLIF Reserve"). Both the DLIFF Interim Distribution and the DLIF Reserve would be paid from the collateral of DLIF and DLIFF so no other rights of any creditor would be impaired.[3]

## III.    The Claims Stipulation

The Claims Stipulation provides, in relevant part, that:

1.  DLIF's net investment of cash into the Master Fund is $359,589,934 (the "DLIF Claim") and DLIFF's net investment of cash into the Master Fund is $158,197,708 (the "DLIFF Claim").

2.  The funds distributed to DLIFF pursuant to the Claims Stipulation and the Distribution Plan (the "DLIFF Distribution") shall be distributed to the JOLs and shall be held by the JOLs for administration and distribution in the Cayman Liquidation in accordance with the laws of the Cayman Islands.

3.  DLIFF's creditors and stakeholders shall not be allowed duplicate claims in the Receivership Case and shall not receive a distribution directly in the Receivership Case.

---

[3] The Receiver presently holds approximately $200 million of cash on hand and all of those funds, with the exception of $6,262,500 derived from $5,870,161 of cash on hand at the date of the Receivership, $119,127 from office sublease rents, $94,979 from sale of office assets, $77,048 from interest income, $81,135 from vendor refunds and $20,050 from employee salary reimbursements, are the collateral of DLIFF and DLIF.

4. Claims allowance for the investors and creditors of the U.S. Reeceivership Entities will be made in accordance with U.S. law, and shall not be paid from the DLIFF Distribution.

5. The Receiver shall make the DLIFF Interim Distribution in the amount of $10 million upon Court approval of the Claims Stipulation;

6. Except for the provision regarding the Interim Distribution, the remainder of the provisions of the Claims Stipulation is contingent upon approval of the Receiver's proposed Distribution Plan.

The Claims Stipulation provides resolution and certainty as to the allocation of funds as between DLIF and DLIFF.

## IV.   Summary of Distribution Plan

The Receiver has filed concurrently herewith, a Motion to Approve Distribution Plan, which requests approval of his proposed Distribution Plan. The Distribution Plan does NOT seek relief relative to the claimants or shareholders of DLIFF. [4]

In summary, the Receiver's Distribution Plan divides the classes of claimants into the following general categories for the following priority treatment:

Class 1:   Administrative Professional Fees and Claims: To be paid in full up to the Allowed Amount of the Claims.

Class 2:   Priority Tax and Wage Claims: To be paid in full up to the Allowed Amount of the Claims.

Class 3:   DLIFF's Claim pursuant to the Claims Stipulation: To share the funds remaining after payment of Classes 1 and 2, to be split on a *pro rata* basis with Class 4 DLIF Investor Claims pursuant to the Claims Stipulation.

---

[4] Any investors who originally invested in DLIF and later transferred their account to DLIFF are deemed DLIFF claimants and are not to receive any distributions pursuant to this Distribution Plan.

Class 4A:    DLIF Administrative Claims: Will be paid up to the full amount of such Allowed DLIF Administrative Claims from distributions made in respect of the DLIF Claim under the Claims Stipulation.

Class 4B:    DLIF Investor Claims: Except for proceeds of DLIF Avoidance Actions which shall be distributed solely to Class 4A and 4B, to share the funds remaining after payment of Classes 1, 2, and 4A to be split on a *pro rata* basis with the Class 3 DLIFF Claim pursuant to the Claims Stipulation. Distribution to Class 4 Investors shall be made pursuant to the Rising Tide methodology.

Class 5:     Allowed Unsecured Creditors: To receive distribution only upon payment in full of Classes 1, 2, 3 and 4.

Class 6:     Allowed Indemnity Claims: To receive distribution only upon payment in full of Classes 1, 2, 3, and 4, and to be paid *pro rata* with Classes 5 and 7.

Class 7:     Allowed Counterparty Claims: Allowed Counter-Party Claims: To receive distribution only upon payment in full of Classes 1, 2, 3, and 4, and to be paid *pro rata* with Classes 5 and 6.

Class 3 consists only of the DLIFF claim as set forth in the DLIFF Claims Stipulation. Distribution on account of Class 3 shall be made only after Classes 1 and 2 have been paid in full or sufficient reserves are held to ensure payment in full to Classes 1 and 2. Distributions in respect of DLIFF's Claim will be paid to the JOLs. Any funds paid to the JOLS shall be distributed by the JOLs in the Cayman proceeding pursuant to Cayman law.

Class 4, which will share *pro rata* with Class 3 based upon the allocation set forth in the Claims Stipulation, consists of the Investors in DLIF who hold Allowed Claims. Distribution on account of Class 4 shall be made only after Classes 1 and 2 have been paid in full. The DLIF Investors will be treated as a single class because they are similarly situated in that the funds of the DLIF Investors were commingled in various transactions and entities.

## V.      The Claims Stipulation is in the Best Interest of the Estate.

The Receiver believes in his business judgment that the proposed Claims Stipulation is fair, reasonable, and in the best interests of the Receivership estate. The Claims Stipulation provides for the allowance of the claims of DLIF and DLIFF pursuant to the terms of the LSA. The dollar amount of the claims are based on the net amount that DLIFF and DLIF, respectively, invested into the Master Fund.  The LSA by its terms granted DLIFF and DLIF security interests in the loans and equity investments made by DLI Capital.

The principal purpose of a receivership is to marshal the estate's assets for the benefit of aggrieved investors and other creditors of the receivership entity.  *See SEC v. Hardy*, 803 F.2d 1034, 1058 (9th Cir. 1986). Receivership courts, like bankruptcy courts, have discretion to approve settlements of disputed claims to receivership assets.  *See e.g.*, *Richie Capital Mgmt., v. Kelley*, 785 F.3d 273, 278 (8th Cir. 2015.) There are no "federal rules [that] prescribe a particular standard for approving settlements in the context of an equity receivership; instead a district court has wide discretion to determine what relief is appropriate." *Gordon v. Dadante*, 336 F. App'x 540, 549 (6th Cir. 2009).  Nonetheless, in this Circuit, the Court must consider the following factors in examining a proposed settlement:  the probability of success in the litigation; the difficulties, if any, to be encountered in the matter of collection; the complexity and expense of the litigation; and the paramount interests of creditors, giving proper deference to their reasonable views regarding the proposed

1    compromise. *Sec. & Exch. Comm'n v. Ruderman*, No. CV 09-02974, 2011 WL

2    5857452, at *3 (C.D. Cal. Nov. 21, 2011).)   "Although the Court may not simply

3    'rubber-stamp' the decision to enter into a settlement, it need not conduct an

4    exhaustive investigation, hold a mini-trial on the merits of the claims sought to be

5    compromised, or require that the settlement be the best that could possibly be

6    achieved." *Id.*

7         This Court is instructed by Local Rule 66-8 to look to bankruptcy courts for

8    guidance in the receivership context (L.R. 66-8). The Ninth Circuit has held that

9    "[b]efore approving a settlement agreement, the bankruptcy court is charged with

10   considering the 'fairness, reasonableness, and adequacy' of the agreement." *United*

11   *States v. Edwards*, 595 F.3d 1004, 1012 (9th Cir. 2010) (citations omitted.) Because

12   compromises are favored in bankruptcy actions, courts generally give deference to a

13   trustee's business judgment and approve settlements negotiated in good faith and

14   which are "reasonable, fair, and equitable." *Ruderman*, 2011 WL 585752, at *3, *see*

15   L.R. 66-8.   This is consistent with the goal of both receiverships and liquidation

16   bankruptcy actions:  the preservation and fair distribution of the liquidated assets.

17   *Janvey v. Alquire*, No. 3:09-cv-0724, 2014 WL 12654910 at *17 (N.D. Tex. July 30,

18   2014.)

19        The proposed settlement at issue was negotiated in good faith and is

20   "reasonable, fair, and equitable." The Receiver negotiated the Claims Stipulation in

21   his capacity as Receiver with the Cayman JOL in arms length negotiations. While the

22   Receiver is also one of the JOLs, he did not engage in negotiations on behalf of

23   DLIFF and the negotiations took place pursuant to the Protocol.

24        In the Receiver's business judgment, entering into the Claims Stipulation is a

25   reasonable settlement and resolution of the allocation of the available funds in the

26   Receivership Estate as between DLIF and DLIFF. The proposed settlement resolves

27   any disputes relating to allocation as between the two Feeder Funds and provides

28

10

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF RECEIVER FOR:
(1) APPROVAL OF CLAIMS STIPULATION WITH DLIFF JOINT LIQUIDATOR; AND
(2) AUTHORITY TO MAKE INTERIM DISTRIBUTION TO DLIFF

certainty as to the priority of distributions. The stipulation further allows the DLIFF funds to be distributed to non-U.S. investors that invested through DLIFF pursuant to Cayman law through the Cayman liquidation proceeding. Certain material aspects of the Claims Stipulation are contingent upon approval of the Receiver's Distribution Plan which proposes a certain priority of payments to the claimants in the case. The Distribution Plan proposes to pay all Administrative and Priority Claims in full prior to distribution to DLIFF and DLIF (other than Administrative Claims directly attributable to either DLIFF or DLIF as determined by the Receiver in his discretion). The Plan further proposes that DLIFF and DLIF will be paid in full prior to any payment to Creditor Claimants. The Receiver believes that such distribution is fair and equitable in this case, as set forth in his motion to approve the Distribution Plan.

In matters of estate administration, courts are deferential to the business judgment of bankruptcy trustee, receivers, and similar estate custodians. *See, e.g., Bennett v. Williams,* 892 F.2d 822, 824 (9th Cir. 1989) ("[W]e are deferential to the business management decisions of a bankruptcy trustee"); *Southwestern Media, Inc. v. Rau,* 708 F.2d 419, 425 (9th Cir. 1983) ("The decision concerning the form of [estate administration] rested with the business judgment of the trustee"); *In re Thinking Machines Corp.,* 182 B.R. 365, 368 (D. Mass. 1995), *rev'd on other grounds* at 67 F.3d 1021 (1st Cir. 1995) ("The application of the business judgment rule and the high degree of deference usually afforded purely economic decisions of trustee, makes court refusal unlikely"). Citing the *Bennett* and *Southwestern* decisions of the Ninth Circuit and the deference courts provide to the business judgment of receivers in matters of administration of the estate's assets, the Court in *Securities and Exchange Commission v. Path America, LLC,* 2016 WL 3865919 *3 (W.D. Wash. July 15, 2016), approved a receiver's proposed restructuring agreement related to a real property development.  In support of the Court's ability to approve

1  the restructuring recommended by the receiver in that case, the Court explained:

2          The court's authority over the assets of a receivership estate
3          derives from the court's inherent power to exercise
           jurisdiction over assets taken into the receivership, rather
4          than from underlying contracts.   [Citations omitted.]
5          Accordingly, the court has broad equitable powers and
           discretion to grant this motion and authorize and approve
6          the terms of the Restructuring Transaction.

7  *Id.*

8          The Claims Stipulation resolves all claims allowance and distribution issues as

9  between the two feeder funds, which resolves any potential dispute between them as

10 to the amount of the claims or the manner of distribution, both significant benefits

11 under the circumstances. *See Ruderman*, 2011 WL 5856452, at *4 (uncertainty of

12 outcome of litigation "weigh[ed] heavily" in favor of approval of settlement.)  Any

13 litigation regarding these issues would be time consuming and expensive, draining

14 the assets of the estate.   The proposed settlement will avoid the uncertainty and

15 expense of litigation.   The Claims Stipulation additionally reaches an agreement

16 regarding the handling of any proceeds of litigation commenced by the Receiver on

17 behalf of the Master Fund or any other Receivership Entity other than DLIFF or

18 DLIF – *i.e.*, that such proceeds will be shared ratably based on the amounts of the

19 DLIF Claim and the DLIFF Claim. The Claims Stipulation also addresses the

20 allocation of proceeds of any DLIF Avoidance Actions arising from transfers made

21 by DLIF. Such proceeds shall be allocated exclusively to Class 4B DLIF investors

22 pursuant to the Distribution Plan and shall not be subject to the ratable distribution

23 contemplated in the Claims Stipulation. The Claims Stipulation leaves open the

24 allocation of assets, including any proceeds of litigation, that belong solely to either

25 DLIFF or DLIF, other than as described herein.   Such assets, if any, shall be subject

26 to distribution pursuant to a separate agreement or otherwise through the course of

27 the Receivership and/or the Cayman Liquidation.

28

Other than the interim distribution (discussed below), the Claims Stipulation is contingent upon approval of the Distribution Plan, a key component of which provides for distribution to both Feeder Funds on a *pro rata* basis following payment of administrative and priority claims. DLIFF and DLIF share a secured interest in most of the funds presently held by the Receiver as their collateral. The Plan provides that DLIF and DLIFF will share *pro rata* in the funds in the estate after payment of the administrative and priority claims. They hold secured positions in most of the funds that are currently on hand and available for distribution. The Receiver believes that the Claims Stipulation, which provides for all funds that are pooled in the QSF to be distributed pursuant to the priorities set forth in the Plan, is fair and equitable.

Finally, the Claims Stipulation provides for the DLIFF Interim Distribution to be paid to the JOLs for DLIFF in the amount of $10 million, irrespective of whether the Distribution Plan is approved. The Receiver believes that such provision is fair and reasonable given the relatively small amount of the proposed interim distribution ($10 million as compared to the $200 million of cash on hand).  The proposed interim distribution of $10 million to be paid to DLIFF, along with a matching *pro rata* DLIF Reserve,[5] will be paid from the collateral of those two secured creditors. The Receiver will be holding sufficient cash reserves to pay administrative and priority claims in full, and the proposed junior class of unsecured creditors does not hold an interest in the collateral held by the Receiver at this time. Accordingly, no other claimant's interests will be adversely impacted by the proposed DLIFF Interim Distribution.

The DLIFF Interim Distribution assures that the JOLs of DLIFF (which includes the Receiver acting as one of the JOLs) will be able to achieve important

---

[5] The Receiver anticipates seeking authority to make an interim distribution to DLIF claimants in connection with his motion to approve the Distribution Plan.

milestones in the liquidation of DLIFF regardless of the progress of approval of the Distribution Plan (which certain DLIF creditors may contest).  Under Cayman law, the allocation between and among investors and creditors is likely to be more complicated than the corresponding distribution to DLIF investors under U.S. law and may be subject to significant litigation.  In addition to ordinary investors (known as "contributories"), investors that sought to redeem their investments with an effective redemption date prior to the suspension of redemptions may have different rights under Cayman law (these are known as "redemption creditors").   Other stakeholders may have other rights.   While the claims adjudication process has commenced in the Cayman proceeding, it will not be in a position to make further material progress without the funding that will be provided by the DLIFF Interim Distribution.  If there is a delay in approval of the Distribution Plan (which, if it arises, is likely to arise because of disputes as to the distribution priorities among the Receivership claimants), the Receiver believes it would be inequitable to delay the claims adjudication process for DLIFF because of disputes among the investors in DLIF.

The split between DLIFF and DLIF based on the net amount invested by the Feeder Funds into the Master Fund is approximately 31% to 69%. Even if the Receiver reserved in full for the Administrative, Priority and Creditor Claims pending Court approval of the Distribution Plan, there would still be $148.7 million of available cash for distribution, and DLIFF's portion of those funds would be $45.4 million. Therefore, the Receiver believes that the proposed DLIFF Interim Distribution of $10 million is reasonable under the circumstances and will not impair any other parties' rights to distribution.

The Receiver believes that the DLIFF Interim Distribution is necessary to advance the administration of the DLIFF Cayman proceeding. The Receiver believes it is fair and equitable that he be permitted to make an interim payment to DLIFF in

14

the amount of $10 million in advance of final approval of the Distribution Plan under these circumstances.

## VI.    Notice of the Hearing on This Motion Should Be Deemed Appropriate and Sufficient

The Receiver has served notice of the hearing on this Motion on the parties and by mail to the known non-investor creditors of the Receivership Entity.  The Receiver has posted the notice of hearing and the Motion on the Receiver's website (https://cases.stretto.com/dli).   The Receiver has also directed Stretto, his Court-approved claims agent, to email the notice of hearing to all investors.  The Receiver believes this notice complies with the provisions of Local Civil Rule 66-7 to the extent that notice to investors is required.  The Receiver requests that the Court approve this form of notice as reasonable, appropriate, and the most cost-effective means of providing notice of the hearing under the circumstances, since there are approximately 975 investors both in the United States and overseas, and to the extent necessary, to approve the notice given as reasonable, limited notice appropriate under the circumstances and in the interests of time and cost.  This Court, as a court of equity supervising the receivership estate, may make appropriate administrative orders governing the receivership, including limitations on and changes in notice and other procedures.  *See* F.R. Civ. P. 5(a) and (c) (authorizing the court to modify service procedures when numerous defendants are involved in litigation).  In addition, pursuant to Local Civil Rule 66-8, a receiver is directed to administer receivership estates in a manner "as nearly as possible in accordance with the practice in the administration of estates in bankruptcy."  Orders limiting notice when the Bankruptcy Code or Rules would otherwise require notice to all creditors are routinely granted in bankruptcy cases to promote the expeditious and economical administration of bankruptcy estates.  *See In re First Alliance Mortgage Co.*, 269 B.R. 428, 442 (C.D. Cal. 2001) (referencing in *dicta* in the

court's recitation of facts the bankruptcy court's order limiting notice issued in that case); 11 U.S.C. § 102(1)(A) (defining the phrase "after notice and a hearing" to mean "after such notice as is appropriate in the particular circumstances, and such opportunity for hearing as is appropriate in the particular circumstances").

## VII.   CONCLUSION

WHEREFORE, the Receiver respectfully requests that the Court grant the Motion and all relief requested therein.

DATED: November 20, 2020          DIAMOND McCARTHY LLP

By:   /s/ *Kathy Bazoian Phelps*
Kathy Bazoian Phelps
Counsel for Bradley D. Sharp,
Permanent Receiver