KATHY BAZOIAN PHELPS (155564)
kphelps@diamondmccarthy.com
DIAMOND MCCARTHY LLP
1999 Avenue of the Stars, Suite 1100
Los Angeles, California 90067-4402
Telephone: (310) 651-2997

CHRISTOPHER D. SULLIVAN (148083)
csullivan@diamondmccarthy.com
STACEY L. PRATT (124892)
stacey.pratt@diamondmccarthy.com
DIAMOND MCCARTHY LLP
150 California Street, Suite 2200
San Francisco, CA 94111
Phone: (415) 692-5200

*Counsel for Bradley D. Sharp,*
*Permanent Receiver*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION – LOS ANGELES**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>              Plaintiff,<br><br>       v.<br><br>DIRECT LENDING INVESTMENTS LLC,<br><br>              Defendant. | Case No. 2:19−cv−02188−DSF−MRW<br>Hon. Dale S. Fischer<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF RECEIVER FOR APPROVAL OF:**<br><br>**(1) DISTRIBUTION PLAN;**<br>**(2) RISING TIDE DISTRIBUTION METHODOLOGY WITH RESPECT TO DLIF INVESTOR CLAIMS;**<br>**(3) PROPOSED INTERIM DISTRIBUTION; AND**<br>**(4) NOTICE OF DISTRIBUTION PLAN** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Date:     December 21, 2020
Time:     1:30 PM
Place:    Courtroom 7D
          United States District Court
          Western Division
          350 West 1st Street,
          Los Angeles, CA 90012

# Table of Contents

I.    INTRODUCTION ...................................................................................... 1

II.   STATEMENT OF FACTS ........................................................................ 4

      A.    Procedural History ........................................................................ 4

      B.    Receiver's Investigation and Fraud Findings ............................... 5

      C.    DLIFF Cayman Island Proceeding and Claims Stipulation ........... 9

      D.    Receiver's Conclusions Set Forth in Report ............................... 12

III.  SUMMARY OF DISTRIBUTION PLAN ............................................ 13

      A.    Classes of Claimants ................................................................. 13

      B.    Assets for Distribution to Claimants ........................................ 15

            1.    Pooled Assets ................................................................... 15

            2.    DLIF Avoidance Actions ................................................. 16

      C.    Elimination of Intercompany Claims ........................................ 16

      D.    Class 1: Administrative Claims ................................................ 16

      E.    Class 2: Priority Claims ............................................................ 16

      F.    Class 3: DLIFF's Allowed Claim .............................................. 17

      G.    Class 4A: DLIF Administrative Claims ..................................... 17

      H.    Class 4B: DLIF's Claim ............................................................ 17

      I.    Class 5: General Unsecured Creditor Claims ............................ 22

      J.    Class 6: Indemnity Claims ........................................................ 22

      K.    Class 7: Counter-Party Claims ................................................. 23

IV.   APPROVAL OF THE DISTRIBUTION PLAN IS APPROPRIATE ..... 23

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF RECEIVER FOR APPROVAL OF: DISTRIBUTION PLAN; RISING TIDE DISTRIBUTION METHODOLOGY WITH RESPECT TO DLIF INVESTOR CLAIMS; PROPOSED INTERIM DISTRIBUTION; AND NOTICE OF DISTRIBUTION PLAN

A.   The Court has Broad Authority to Approve an Equitable Distribution Plan ................................................................... 23

B.   Mission to Achieve Fairness Among Investors Guides Court's Application of Power. ................................................. 25

1.   Tracing for Certain DLIF Investors is Not Equitable .......... 26

2.   Modeling for Different Distribution Methodologies ............ 27

3.   The Last Statement Method is Not Equitable ........................ 31

4.   A Net Investment Plan is Not the Most Equitable ................ 33

5.   Rising Tide Method of Distribution is the Most Equitable ................................................................................ 35

V.   ASSETS MAY BE POOLED FOR DISTRIBUTION ............................. 39

VI.   SUBORDINATION OF CLAIMS ......................................................... 41

VII.   CONSOLIDATION OF MULTIPLE ACCOUNTS UNDER PLAN IS APPROPRIATE. ............................................................................ 45

VIII.   AN INTERIM DISTRIBUTION OF $150 MILLION IS APPROPRIATE ................................................................................. 47

IX.   NOTICE OF THE HEARING ON THIS MOTION SHOULD BE DEEMED APPROPRIATE AND SUFFICIENT ................................... 47

X.   CONCLUSION ................................................................................... 49

# <u>Table of Authorities</u>

<u>Cases</u>

*CFTC v. Barki*, LLC,
    2009 U.S. Dist. LEXIS 112998(W.D.N.C. Nov. 12, 2009) ................................29

*CFTC v. CapitalStreet Financial, LLC*,
    2010 U.S. Dist. LEXIS 75113, at *7 (W.D.N.C. June 18, 2010)..................34, 41

*CFTC v. Eustace*, 2008 U.S. Dist. LEXIS 11810.......................................................40

*CFTC v. Hoffberg*,
    1993 U.S. Dist. LEXIS 15173, at *4 (N.D. Ill. Oct. 28, 1993) ..........................37

*CFTC v. Lake Shore Asset Management. Ltd*.,
    2010 U.S. Dist. LEXIS 24061, at *28 (N.D. Ill. Mar. 15, 2010) ..................29, 35

*CFTC v. Richwell Int'l, Ltd*.,
    163 B.R. 161 (N.D. Cal. 1994) ...........................................................................31

*CFTC v. Rust Rare Coin*,
    2020 U.S. Dist. LEXI 152245 (D. Utah Aug. 20, 2020)................................35, 38

*Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd.,*
    205 F.3d 1107 (9th Cir. 2000) ............................................................................27

*Commodity Futures Trading Com'n v. Equity Financial Group, Inc.*
    (D.N.J., Sept. 2, 2005, No. CIV.04-1512 RBK AMD) 2005 WL 2143975..passim

*Cunningham v. Brown*,
    265 U.S. 1 (1924).........................................................................................2, 25

*In re Bernard L. Madoff Investment Securities, LLC*,
    (S.D.N.Y., Jan. 14, 2016, No. 15 CIV. 1151 (PAE)) 2016 WL 183492..............31

*In re Christian Life Center*,
    821 F. 2d 1370 (9th Cir. 1987) ...........................................................................43

*In re First Alliance Mortgage Co.*,
    269 B.R. 428 (C.D. Cal. 2001) ...........................................................................48

*In re Tedlock Cattle Company, Inc.*,
   552 F.2d 1351 (9th Cir. 1977) .......................................................................32

*International Manufacturing Co. v. Landon, Inc*.,
   327 F.2d 824 (9th Cir. 1964) .........................................................................25

*Liberte Capital Group, LLC v. Capwill*,
   148 Fed.Appx. 426 (6th Cir. 2005) ...............................................................33

*Quilling v. Trade Partners, Inc.*,
   2007 WL 107669, * 1 (W.D. Mich. 2007) ....................................................24

*Reebok Int'l v. Marnatech Enter., Inc*.,
   970 F.2d 552 (9th Cir.1992) ..........................................................................24

*S.E.C. v. Byers*,
   637 F. Supp. 2d 166 (S.D.N.Y. 2009) .....................................................passim

*S.E.C. v. Credit Bancorp, Ltd.*,
   290 F.3d 80 (2d Cir. 2002) ......................................................................27, 34

*S.E.C. v. Founding Partners Capital Mgmt.*,
   Case No. 2:09-cv-229-FTM-29SPC, 2014 WL 2993780 at *6
   (M.D. Fla. July 3, 2014) .................................................................................34

*S.E.C. v. Huber*,
   702 F.3d 903 (7th Cir. 2012) .........................................................................35

*S.E.C. v. J.P. Morgan Sec., LLC*,
   266 F. Supp. 3d 225 (D.D.C. 2017)...............................................................34

*S.E.C. v. McGinn, Smith & Co., Inc.*,
   2016 WL 6459795 at *2 (N.D.N.Y. Oct. 31, 2016)..................................24, 25

*S.E.C. v. Quan*,
   870 F.3d 754 (8th Cir. 2017) ....................................................................27, 34

*S.E.C. v. Wealth Mgmt. LLC*,
   628 F.3d 323 (7th Cir. 2010) .........................................................................27

*SEC v. AmeriFirst Funding*,
   2008 U.S. Dist. LEXIS 20044 ......................................................................31

iv

*SEC v. Basic Energy*,
   273 F.3d 657 (6th Cir. 2001) ................................................................24

*SEC v. Bivona*,
   (N.D. Cal., Sept. 13, 2017, No. 16-CV-01386-EMC)
   2017 WL 4022485 ...............................................25, 27, 40, 41

*SEC v. Brian A. Bjork*,
   No. 4:11-cv-2830 (S.D. Tex. 2013) .......................................................42

*SEC v. Capital Consultants, LLC*,
   397 F.3d 733 (9th Cir. 2005) ...........................................................25, 33

*SEC v. Credit Bancorp, Ltd*.,
   2000 U.S. Dist. LEXIS 17171, at *97 (S.D.N.Y. Nov. 29, 2009) ......................34

*SEC v. Elliott*,
   953 F.2d 1560 (11th Cir. 1992) .....................................................24, 30, 33

*SEC v. Forex Asset Mgmt. LLC*,
   242 F.3d 325 5th Cir. 2001) ................................................................24

*SEC v. Francisco Illarramendi*,
   2014 U.S. Dist. LEXIS 16459 (D. Conn. Feb. 14, 2014)..............................43

*SEC v. Hardy*,
   803 F.2d 1034 (9th Cir. 1986) ............................................................24

*SEC v. HKW Trading LLC*,
   No. 8:05-cv- 1076-T-24-TBM, 2009 U.S. Dist. LEXIS 77215, at *8
   (M.D. Fla. Aug. 14, 2009) ...............................................................41

*SEC v. Keller Corp*.,
   323 F.2d 397 (7th Cir. 1963) .............................................................25

*SEC v. Lincoln Thrift Ass'n*,
   577 F.2d 600 (9th Cir. 1978) .............................................................24

*SEC v. Parish*,
   No. 2:07-cv-00919-DCN, 2010 U.S. Dist. LEXIS 11757
   (D.S.C. Feb. 10, 2010) ...................................................................36

v

*SEC v. Sunwest Mgmt.*,
No. 09-6056-HO, 2009 U.S. Dist. LEXIS 93181, at *34
(D. Or. Oct. 1, 2009) ............................................................................40

*SEC v. Wang*,
944 F.2d 80 (2d Cir. 1991) ................................................................24

*SEC. v. TLC Investments and Trade Co.,*
147 F.Supp.2d 1031 (C.D. Cal. 2001) ..............................................33

*Trustees of Amalgamated Zins. Fund v. McFarlin's, Inc.,*
789 F.2d 98 (2d Cir. 1986) ................................................................43

*U.S. v. Wilson*,
659 F.3d 947 (9th Cir. 2011) .......................................................27, 40

*United States v. Cabe*,
311 F. Supp. 2d 501 (D.S.C. 2003) .............................................36, 37

*United States v. Durham*,
86 F.3d 70 (5th Cir.1996) ...........................................................27, 40

*United States v. Garcia*,
37 F.3d 1359 (9th Cir. 1994) .............................................................41

*United States v. Real Property Located at 13328 and 13324 State Highway 75 North*,
89 F.3d 551 (9th Cir.1996) ..........................................................26, 40

*United States v. Vanguard Inv. Co.,*
6 F.3d 222 (4th Cir.1993) ..................................................................33

**Statutes and Rules**

11 U.S.C. § 102(1)(A) ...........................................................................48

11 U.S.C. § 503 ......................................................................................43

F.R. Civ. P. 5 (c) ...................................................................................48

F.R. Civ. P. 5(a) ....................................................................................48

Local Civil Rule 66-8 ...........................................................................48

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF RECEIVER FOR APPROVAL OF: DISTRIBUTION PLAN; RISING TIDE DISTRIBUTION METHODOLOGY WITH RESPECT TO DLIF INVESTOR CLAIMS; PROPOSED INTERIM DISTRIBUTION; AND NOTICE OF DISTRIBUTION PLAN

**Treatises**

Clark,
  TREATISE ON THE LAW AND PRACTICE OF RECEIVERS
  § 662.1(a)...................................................................................41

Clark,
  TREATISE ON THE LAW AND PRACTICE OF RECEIVERS
  § 667 .........................................................................................42

**Regulations**

Internal Revenue Service Reg. §1.468B-2(k)(2)........................................4

Treasury Regulation § 1.468B(1)(c)...........................................................4

1    Bradley D. Sharp, the Court-appointed permanent receiver (the "Receiver") for the

2    estate of Direct Lending Investments, LLC ("DLI"), Direct Lending Income Fund, L.P.

3    ("DLIF" or the "Onshore Fund"), Direct Lending Income Feeder Fund, Ltd. ("DLIFF"

4    or the "Offshore Fund" and together with DLIF, the "Feeder Funds"), DLI Capital, Inc.

5    (DLI Capital"), DLI Lending Agent, LLC ("DLIA"), DLI Assets Bravo LLC ("DLIAB"),

6    and their successors, subsidiaries and affiliated entities (collectively, the "Receivership

7    Entities") pursuant to the Preliminary Injunction Order and Order Appointing Permanent

8    Receiver issued April 1, 2019 ("Receiver Order") (Doc. No. 10), hereby files his Motion

9    for Approval of (1) Distribution Plan; (2) Rising Tide Distribution Methodology; (3)

10   Proposed Interim Distribution; and (4) Notice of Distribution Plan (the "Motion").

## I.       INTRODUCTION

12   The Receiver has conducted a thorough evaluation of the pre-Receivership

13   activities in this case which has revealed that a fraudulent scheme orchestrated by its

14   former CEO Brendan Ross was run through the Receivership Entities from inception.

15   Among other things, the scheme involved misrepresentations to investors, over-stated

16   valuations of assets, and misappropriated funds, all of which had the impact of harming

17   the Receivership Entities to the detriment of the investors and ultimately turning the

18   operations into an insolvent Ponzi scheme. The results of the Receiver's investigation are

19   set forth in detail in the Report Regarding the Investigation of the Receivership Entities'

20   Business Conduct and Recommendations Regarding Distributions dated November 13,

21   2020, attached to the Declaration of Bradley Sharp as Exhibit "1" (the "Report").

22   The Receiver's Report focuses on the conduct of (i) DLI, which acted as the

23   investment manager and is the defendant in this civil action; (ii) DLI Capital, which

24   received capital from the Feeder Funds; with its subsidiaries DLIA and DLIAB, both of

25   which made loans and investments to borrowers, as further described below (collectively

26   the "Master Fund"); and (iii) DLIF, which solicited investment from U.S. based investors.

27   Investment was also sought from non-U.S. investors DLIFF, a Cayman Islands exempted

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF RECEIVER FOR APPROVAL OF: DISTRIBUTION PLAN; RISING TIDE DISTRIBUTION METHODOLOGY WITH RESPECT TO DLIF INVESTOR CLAIMS; PROPOSED INTERIM DISTRIBUTION; AND NOTICE OF DISTRIBUTION PLAN

company.   While DLIFF is one of the Receivership Entities, the liquidation and distribution of its assets is subject to a separate Cayman Islands liquidation proceeding, which proceeding is governed by Cayman Islands law and is subject to the supervision of the Grand Court of the Cayman Islands.

Because of the vast discrepancy between the stated value of the assets at the start of the Receivership and their true value, claimants cannot be made whole from the available assets. The Receiver faces a challenging decision of how to allocate the available assets amongst the claimants. Mindful of the principle that "equality is equity,"[1] the Receiver has evaluated the different possible approaches to distribution to attain the greatest equity in this case.

The Receiver has run a thorough claims process and has undertaken a review of the claims submitted and the impact of different distribution models on the creditor body to assist him in fashioning a distribution plan in this case that is equitable under the circumstances. The following classes of Claimants have asserted claims against the Receivership Estate: Administrative Claims[2]; Priority Claims; DLIFF through its joint official liquidators in the pending Cayman liquidation proceeding; DLIF Administrative Claims; DLIF Investors; General Unsecured Creditor Claims; Indemnity Claims; and Counter-Party Claims. A copy of the Receiver's proposed Distribution Plan is attached to the Sharp Declaration as Exhibit "2" and, by this Motion, the Receiver requests approval of the Distribution Plan. The Plan recommends a priority of distributions from the Receivership Estate fund to the following classes of claimants: Administrative Claims (Class 1); Priority Claims (Class 2); DLIFF (Class 3) to be shared on a *pro rata* basis with DLIF Administrative Claims (Class 4A) and claims of DLIF Investors (Class 4B);

---

[1] *Cunningham v. Brown*, 265 U.S. 1 (1924).

[2] Capitalized terms not defined in this Motion, shall have the respective meanings assigned to them in the proposed Distribution Plan attached to the Sharp Declaration as Exhibit "2."

General Unsecured Creditor Claims (Class 5); Indemnity Claims (Class 6); and Counter-Party Claims (Class 7).

The Plan proposes a distribution methodology to Class 4 DLIF Investors that is based upon an equitable *pro rata* methodology called Rising Tide as set forth herein. Without consideration of any additional assets that might arise from litigation efforts, the Receiver estimates that the aggregate recovery to the  DLIF Investors – from a combination of Pre-Receivership Returns and distributions under the proposed Plan – will on average be approximately 30.53% of the dollars invested in connection with the $150 million Interim Distribution.[3] To assist the Court and interested parties in evaluating the Distribution Plan, the Receiver has analyzed the claims under the two most common equitable *pro rata* distribution models (Rising Tide and Net Investment), and has also analyzed the claims under a Last Statement methodology. Fortunately, the results of this analysis show that the vast majority (64.8%) of the DLIF Investor claimants fare better under one method, the Rising Tide method, which the Receiver also has concluded is the most equitable in the case.  Since the Receiver's analysis shows that 592 out of 914 DLIF Investors with Allowed Claims will receive a greater distribution under the Rising Tide methodology and the facts and circumstances of this case support the use of the Rising Tide method, the Receiver has concluded that this is the most equitable methodology for distribution in this case to Class 4 DLIF  Investors.

In summary, this Motion requests:

1.   Approval of the Distribution Plan attached to the Sharp Declaration as Exhibit "2";

2.  Approval of the Rising Tide methodology of distribution to the DLIF  Investors in Class 4B;

---

[3] The Receiver hopes to achieve a 50% return to investors in subsequent distributions as he continues to collect additional funds.

3. Approval of the proposed interim distribution of $150 million pursuant to the terms of the proposed Distribution Plan; and

4. Approval of the form of notice of this Motion.

## II. STATEMENT OF FACTS

### A. Procedural History

The SEC filed a complaint against DLI on March 22, 2019, alleging fraud by DLI in violation of various federal securities law, including Sections 206(1) and 206(s) of the Advisors Act, Section 10(b) of the Exchange Act and Rule 10(b)(6), and Section 17(a) of the Securities Act, and Section 207 of the Advisers Act (the "Complaint"). The SEC alleges in the Complaint that "this matter concerns a multi-year fraud perpetrated by Defendant DLI, a registered investment adviser, through its then-principal, Brendan Ross, which resulted in approximately $11 million in over-charges of management and performance fees to fund investors, and the inflation of DLI's private funds' returns."

The Receiver was appointed as receiver over the Receivership Entities by order entered on April 1, 2019. A qualified settlement fund ("QSF") was established by operation of law pursuant to Internal Revenue Service Reg. §1.468B-2(k)(2) on the date of commencement of the Receivership, or April 1, 2019, and the Receiver has filed a QSF tax return for the Receivership stub period of April 1, 2019 through December 31, 2019, consistent with the provisions of Treasury Regulation § 1.468B(1)(c) and based on his understanding that criteria mandating the establishment of a QSF were present in this case.

On August 11, 2020, Brendan Ross, the former chief executive officer ("Ross" or "CEO") of DLI, was arrested by special agents of the FBI following a grand jury indictment on ten counts of wire fraud filed July 30, 2020. The indictment charges that "[b]eginning no later than in or about December 2013, and continuing to in or about March 2019 . . . defendant Ross, and others known and unknown to the Grand Jury, knowingly with the intent to defraud, devised, participated in, and executed a scheme to

4

defraud the [f]unds, their investors, and Purchaser 1 as to material matters, and to obtain money and property from the victims by means of material, false and fraudulent pretenses, representations and promises, and the concealment of material facts."[4] Further, "between April 2014 and January 2018, as a result of false and fraudulent monthly reports that Ross caused Company 1 to prepare, Ross caused the fund's monthly asset values to be cumulatively inflated by over $300 million."[5]

The SEC has also filed a civil complaint against Ross in the United States District Court for the Central District of California alleging Ross defrauded investors of DLI, and seeking disgorgement of all funds received from his illegal conduct and civil penalties. The SEC alleges Ross engaged in fraud as an investment adviser; committed fraud in connection with the purchase and sale of securities; and filed false registration forms with the SEC. The civil enforcement action alleges that Ross orchestrated an intricate, multi-year fraud by inflating the value and returns for an investment position held by the investment funds, starting in or around early 2014 through March 2019.[6]

**B. Receiver's Investigation and Fraud Findings**

The Receiver and his professionals have investigated the pre-Receivership business activities of the Receivership Entities as well as the sources and uses of cash paid into the Receivership Entities. The results of his investigation, set forth in detail in the Report attached as Exhibit "1," reveal fraudulent activity from the inception that led DLIF Investors to invest in the same pool of assets, while their funds were commingled with each other and with proceeds of the loan portfolios held by the Receivership Entities. The Receiver's investigation has uncovered a pervasive fraud that morphed into a Ponzi

---

[4] *United States of America v. Brendan Ross, aka "Brandon Rosen,"* Case No. 2:20-cr-00327-CSF, United States District Court, Central District of California, Indictment, at ¶19.

[5] *Id.* at ¶ 20(d)(iii).

[6] *See Securities and Exchange Commission v. Brendan Matthew Ross*, Case No. 2:20-cv-07202, United States District Court, Central District of California, Dkt. No 1, at ¶¶ 4, 6, 8-10.

scheme as the fraud and commingling of funds grew. There are multiple factors revealing that the fraud turned into a Ponzi scheme, including but not limited to the fact that substantial redemptions and distributions were financed by fundraising efforts and paid from the commingled funds of similarly situated defrauded victims. By early-2016 at the latest DLIF lacked sufficient assets to repay the capital invested by the DLIF Investors. The Ponzi scheme factors are addressed in the Report for purposes of providing the full picture of the nature and extent of the fraud. The Receiver is not seeking a judicial determination of a Ponzi scheme at this time, but reserves the right to do so if and when such a finding becomes necessary.

The Receiver has concluded that the actions of Ross were fraudulent and led to substantial misrepresentations made to DLIF Investors from the outset. Ross and DLI then invested the funds in risky investments that led to those losses. Those losses in turn, impacted the investors who will suffer cash losses totaling $250.7 million as of March 31, 2019, based on the shortfall between the amount of net invested capital and the estimated future distributions to investors ("Aggregate Investor Cash Losses").[7]

Some of the more critical factual findings set forth in the Report are as follows:

1. Pervasive fraud and misrepresentations to investors existed in the operations of the U.S. Receivership Entities since inception.

2. Both earlier investors who received a return of some or most of their principal investment and more recent investors who did not receive any cash back were similarly situated as they shared in the same investment assets that were part of the same investment scheme in which their funds were commingled with each other and with proceeds from the loan portfolios.

3. Records of the Receivership Entities show 952 investor accounts with total investor NAV of $757.5 million across the two Feeder Funds as of November 30, 2018, the last period for which the books were closed.

---

[7]  This amount does not account for any lost interest, lost opportunities, excess taxes, or other damages suffered by investors.

4. Excluding DLI's investment account and one of Ross's trust's investment accounts, the total net invested capital was $538.5 million as of March 31, 2019.

5. While some of the counterparty loans made by the Receivership Entities were profitable (though several of those loans generally did not generate returns close to what was represented), the Receiver estimates that there was an aggregate underreported allowance for doubtful accounts and bad debt expense of $501.4 million relative to the obligations of loan counterparties as of March 31, 2019 ("Net Loan Losses") on account of the overstated nature of the loan portfolio and the generally high risk investments, many of which varied from the type and nature of investments promised to investors. In total, Aggregate Investor Cash Losses are estimated at $250.7 million as of March 31, 2019.

6. Of the $1.7 billion in funding for loans to counterparties, only $465.2 million has been repaid in full, with interest, as of July 31, 2020. The $72.9 million return on these fully liquidated loans is insufficient to offset the realized and expected shortfall totaling $305.6 million on funding of $1.3 billion for unrecovered loans. As of July 31, 2020, a total of $232.6 million in principal funding remains unrecovered when including the $72.9 million return on fully liquidated loans. The Receiver estimates that only $123.5 million of that amount will be recovered. There are also significant expenses that have been incurred in order to allow for the estimated future recoveries.

7. Other than with respect to the division of interests in the Master Fund  assets between the two Feeder Funds, no investor held a direct or secured interest in any particular assets of the Receivership Entities.

8. The funds used for payments to any given investor were commingled with other investor funds and, at times, commingled with borrower payments received in connection with the various counterparty loans that were made. Given the commingling of funds and the fungibility of money, it would be a burdensome and costly task to make a specific determination as to whether the source of any given payment made to a particular investor was attributable to funds from later investors or to a payment from a loan portfolio.

9. The accounting records and the account statements delivered to investors, do not reflect appropriate reserves for uncollectable assets and include inflated "mark-ups" relative to appropriate asset valuations, both of which result in a

misrepresentation, value of assets and net worth as well as overstated net asset values ("NAV").[8]

10. 80% of the payments made to investors since inception, either as redemptions or distributions, were derived from funds from later or existing investors (including participation funds from DL Global, Ltd.) rather than from legitimate and profitable returns from the loans to counterparties.

11. DLI made net payments and allocations of $31.4 million directly or indirectly to or for the benefit of Ross.

12. A total of $647 million was loaned to counterparties in which Ross had or may have had a financial interest. For the purposes of the Report, the Receiver estimates an underreported allowance for doubtful accounts and bad debt expense of $343.7 million relative to the obligations of these loan counterparties to the Fund as of March 31, 2019. Ross continued to direct new loans to counterparties even when the losses or poor financial condition of the loan portfolio was evident.

13. 853 DLIF investors received $89.3 million in cash in excess of their investment.

14. Since at least April 30, 2016 forward, DLIF was insolvent[9] when limiting the liability to its investors to the amount of net invested capital. The fraud and increasingly poor counterparty loans resulted in a financial situation where DLIF was unable to return all invested capital to its investors, let alone generate real profits sufficient enough to keep up with the returns paid and/or reported to investors.

15. Investors were subject to the inflated valuations reported by DLI, the misrepresentations made to investors regarding the nature of the investments made with their funds, and the commingling of their funds with other investor funds and loan portfolio proceeds. They were also all subject to the misappropriation of funds and other misconduct by Ross which was a significant cause of the Funds incurring substantial unrecognized losses.

---

[8] The net asset value of the Master Fund is calculated by adding the fair value of its investments, cash, and other assets and subtracting its liabilities in accordance with GAAP.

[9] As used further in the Report, the term "insolvent" refers to the circumstance where the Funds' lacked the financial capacity to pay the restitution claims of the investors and the fact that the Funds were operating with unreasonably small capital. *See* Report at p. 41.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF RECEIVER FOR APPROVAL OF: DISTRIBUTION PLAN; RISING TIDE DISTRIBUTION METHODOLOGY WITH RESPECT TO DLIF INVESTOR CLAIMS; PROPOSED INTERIM DISTRIBUTION; AND NOTICE OF DISTRIBUTION PLAN

## C. DLIFF Cayman Island Proceeding and Claims Stipulation

DLIFF, a Cayman Islands Exempted Company formed in 2016, is the offshore investment entity that solicited overseas investor funds. Prior to a restructuring of the fund structure managed by DLI in October 2016, all domestic and foreign investors invested through DLIF, which then invested its funds first in two holding companies, DLIAB and DLI Assets. In October 2016, DLI moved to a two-feeder fund structure with the formation of DLIFF, the offshore limited partnership in the Cayman Islands, along with DLIF serving as the onshore fund. DLI Capital served as a Master Fund through which investor funds solicited through DLIF and DLIFF were contributed and deployed. DLI formed DLIFF to solicit investments from non-United States investors. The funds invested into the Feeder Funds were contributed to DLI Capital as both debt and equity. That capital was, in turn, contributed to DLI Capital's wholly owned subsidiaries DLIA and DLIAB, DLIA and DLIAB thereafter loaned these funds to putative third party borrowers. These borrowers in turn were generally lenders which made loans or extensions of credit to others (the "subsequent loans").

The new structure was formalized in two Loan and Security Agreements each dated as of October 1, 2016 ("LSA"), one with DLIF as lender and one with DLIFF as lender, and with Millennium Trust Company, LLC as the custodian for the benefit of each of the lenders. Under each of the LSAs, the Feeder Funds agreed to lend money to DLI Capital as a borrower under a revolving loan facility. DLI Capital in turn would use the invested funds to make equity investments in two subsidiaries DLI Assets and DLIAB, and those entities typically made loans to third party borrowers (the "subsequent loans" referred to above) generally on a secured basis. The LSAs by their terms granted DLIF and DLIFF security interests in the loans and equity investments made by DLI Capital. The collateral for the loans under the LSAs is described as all the "Collateral Assets" of DLI Capital, including all the loans made and collateral received by DLI Capital, along with DLI Capital's ownership interests in any subsidiaries, funds in a control deposit

account for the deposit of the underlying loan payments received by DLI Capital, and all other assets of DLI Capital.

DLIF and DLIFF also entered into an Intercreditor Agreement dated as of September 30, 2016, which provided for the lenders DLIF and DLIFF to have *pari passu* rights in the loans made to DLI Capital. The *pari passu* rights were stated to extend to the notes in favor of DLIF and DLIFF by DLI Capital, the collateral for the notes, and all payments and collections or proceeds of enforcement of the loans received by either DLIF or DLIFF.

Shortly after his appointment, the Receiver, upon Court approval, on behalf of DLI Capital, passed a unanimous resolution to place DLIFF in voluntary liquidation under the applicable laws of the Cayman Islands. The voluntary liquidators subsequently filed an application by way of a petition in the Grand Court of the Cayman Islands (the "Cayman Court") for the liquidation to continue under the supervision of the Cayman Court. On July 25, 2019, the Cayman Court entered a Supervision Order (the "Supervision Order") converting the voluntary liquidation to an official liquidation, and Bradley D. Sharp of Development Specialists Inc. and Christopher D. Johnson of Chris Johnson Associates Ltd. were appointed and currently serve as the Joint Official Liquidators ("JOLs") of DLIFF. The liquidation of DLIFF pursuant to the Supervision Order under the laws of the Cayman Islands is hereafter referred to as the "DLIFF Liquidation").

On August 22, 2019, the JOLs sent a notice to the creditors and shareholders of DLIFF of a meeting of creditors and contributories. Creditors wishing to attend the meeting were asked to submit a proof of debt form to the JOLs in advance of the meeting. All claims against and interests in DLIFF are to be pursued directly in the DLIFF Liquidation, in accordance with the laws of the Cayman Islands, including without limitation, Order 16 of the Companies Winding Up Rules 2018 and the Companies Law (2020 Revision) applicable to liquidation proceedings in that

jurisdiction. This Distribution Plan does NOT seek relief relative to the claimants or shareholders of DLIFF.[10]

The Receiver, in his capacity as U.S. Joint Official Liquidator in the Cayman Proceeding, and the Cayman JOL, Christopher D. Johnson (the "Cayman JOL"), agreed to a conflict resolution protocol (the "Protocol") that was submitted to the Cayman Court and was approved by that court on July 16, 2020. This Court subsequently also approved the Protocol. (Doc No. 293).

Utilizing the Protocol, the Receiver and the Cayman JOL negotiated a stipulation regarding the amounts for DLIFF and DLIF in the Receivership case for purposes of determining the respective allocation of funds between DLIFF and DLIF in connection with the Distribution Plan (the "Claims Stipulation"), copy of which is attached to the Sharp Declaration as Exhibit "3."

The Receiver has filed a motion concurrently herewith seeking Court approval of the Claims Stipulation which provides, in relevant part, that:

1. DLIF's net investment of cash into the Master Fund is $359,589,934 (the "DLIF Claim") and DLIFF's net investment of cash into the Master Fund is $158,197,708 (the "DLIFF Claim").

2. The funds distributed to DLIFF pursuant to the Claims Stipulation and the Distribution Plan (the "DLIFF Distribution") shall be distributed to the JOLs and shall be held by the JOLs for administration and distribution in the Cayman Liquidation in accordance with the laws of the Cayman Islands.

---

[10] Any investors who originally invested in DLIF and later transferred their account to DLIFF are deemed DLIFF claimants and are not to receive any distributions pursuant to this Distribution Plan.

3. DLIFF's creditors and stakeholders shall not be allowed duplicate claims in the Receivership Case and shall not receive a distribution directly in the Receivership Case.

4. Claims allowance for the investors and creditors of the U.S. Receivership Entities will be made in accordance with the U.S. law, and shall not be paid from the DLIFF Distribution.

5. The Receiver shall make an advance on the DLIFF Interim Distribution in the amount of $10 million upon Court approval of the Claims Stipulation.

6. Except for the provision regarding the Interim Distribution, the remainder of the provisions of the Claims Stipulation is contingent upon approval of this Distribution Plan.

The DLIFF Claims Stipulation provides resolution and certainty as to the allocation of funds as between DLIF and DLIFF.

**D. Receiver's Conclusions Set Forth in Report**

1. Under U.S. law, each investor in DLIF (each a "DLIF Investor") is similarly situated and holds the same type of claim for restitution on account of that fraud. The fraud was a substantial factor causing the losses of DLIF Investors.

2. Irrespective of whether a Ponzi scheme exists, the Distribution Plan should be based on the principal that for DLIF Investors subject to U.S. rules, similarly situated investors must be treated alike to preserve equity and fairness and that all fraud victims should be treated alike, as is required by applicable U.S. law. The pervasiveness of the fraud and the commingling of assets are sufficient to warrant the pooling of the assets and liabilities for purposes of distributions to be made under any Distribution Plan.

3. It is unlikely that investors will be repaid in full. It would be inequitable as a matter of U.S. law to distribute assets based on an assumption that an investor should recover both fictitious profits and principal based on a benefit of bargain basis since (a) reports of returns were made to all investors based on misrepresented NAV figures; and (b) earlier investors were repaid at the expense, and to the detriment, of the similarly situated later investors.

4.  The best way to put the DLIF Investors on equal footing is to treat the prior payments made to these investors, whether as distributions or redemptions, as a return of principal, so that the DLIF Investors who receive a distribution through the Distribution Plan may share on a *pro rata* and equitable basis.

5.  The assets and liabilities of the Receivership Entities must be pooled together in order to equitably and sensibly account for all of the assets of the Receivership Entities and to fairly make distributions to DLIF Investors and other creditors of the Receivership Entities who will receive a distribution pursuant to the Distribution Plan.[11]

6.  Because Investors have received differing levels of returns, a distribution method that seeks to equalize returns to the Investors would be most equitable.

## III.    SUMMARY OF DISTRIBUTION PLAN

### A. Classes of Claimants

The Receiver's Distribution Plan divides the classes of claimants into the following general categories for the following priority treatment:

Class 1:    Administrative Professional Fees and Claims: To be paid in full up to the Allowed Amount of the Claims.

Class 2:    Priority Claims: To be paid in full up to the Allowed Amount of the Claims.

Class 3:    DLIFF's Allowed Claim pursuant to DLIFF Claims Stipulation: To share the funds remaining after payment of Classes 1 and 2, to be split on a *pro rata* basis with Class 4 DLIF Investor Claims pursuant to the DLIFF Claims Stipulation.

Class 4A:   DLIF Administrative Claims will be paid up to the full amount of such Allowed DLIF Administrative Claims from

---

[11] The only exception that arises is with respect to the assets and liabilities of DLIFF, which are subject to a separate liquidation proceeding in the Cayman Islands.

13

distributions made in respect of the DLIF Claim under the Claims Stipulation.

Class 4B:    DLIF Investor Claims: To share the funds remaining after payment of Classes 1 and 2, to be split on a *pro rata* basis with Class 3 DLIFF Claim pursuant to the Claims Stipulation. Distribution to Class 4 Investors shall be made pursuant to the Rising Tide methodology.

Class 5:    Allowed General Unsecured Creditors: To receive distribution only upon payment in full of Classes 1, 2, 3 and 4, and to be paid *pro rata* with Classes 6 and 7.

Class 6:    Allowed Indemnity Claims: To receive distribution only upon payment in full of Classes 1, 2, 3, and 4, and to be paid *pro rata* with Classes 5 and 7.

Class 7:    Allowed Counter-Party Claims: To receive distribution only upon payment in full of Classes 1, 2, 3, and 4, and to be paid *pro rata* with Classes 5 and 6.

As provided under the Distribution Plan, the Receiver has the right to make and file objections to Claims. The Receiver disputes, or may dispute, a number of Claims, particularly with respect to Indemnity Claims, Counter-Party Claims, and Claims of those who were insiders of the Receivership Entities or were aware of sufficient facts that their receipt of transfers from the Receivership Entities may be subject to Avoidance Actions. The Distribution Plan provides that the Receiver shall file objections to Claims no later 90 days following Court approval of the Plan. The Receiver may also serve written notice (the "Claims Objection Reservation Notice") to any claimant holding or asserting a claim against the Receivership Estate which the Receiver in his business judgment believes may be subject to objection and which may be disallowed in full or in part. In such event, the Receiver shall reserve the full amount of any Disputed Claim pending final allowance or

disallowance of such claim in the event the Receiver makes a distribution prior to resolution.

The major components of the Distribution Plan are as follows.

## B. Assets for Distribution to Claimants

### 1. Pooled Assets

The QSF contains all assets of the Receivership Entities, including any litigation proceeds that may be paid to the Receiver on account of any Cause of Action, Third Party Claim, and any proceeds of litigation brought on behalf of the Master Fund or any other Receivership Entity other than DLIFF or DLIF. Proceeds of DLIF Avoidance Actions are property of the QSF but shall be allocated exclusively to Class 4 as set forth in this Distribution Plan. Proceeds of Feeder Fund Litigation Assets are not allocated in this Distribution Plan and the allocation of any such assets shall be subject to a separate agreement or other resolution between the Receiver and the Cayman JOL.

Assets of the Receivership Entities other than the Feeder Fund Litigation Assets and the DLIF Avoidance Actions will be pooled and will be used to make distributions on Allowed Claims pursuant to the terms of this Distribution Plan. All Allowed Claims to be paid pursuant to this Distribution Plan shall be paid from the assets in the QSF. Allocations of assets in the QSF between Classes 3 and 4 will be made pursuant to the terms of the Claims Stipulation as incorporated in this Distribution Plan.

All of the assets for the Receivership Entities are now in the QSF, as will be any litigation proceeds received from the results of any litigation claims filed by the Receiver, other than as set forth in the Distribution Plan and the Claims Stipulation. The Receiver believes that the pooling of assets is proper as set forth in the Distribution Plan, and he is not aware of any basis, in equity or otherwise, to separate any particular assets for any particular claimant. No particular funds or assets were segregated for a single-purpose entity or for a particular claimant. The pooled assets shall be distributed on the priority basis and pursuant to the distribution methodology set forth below.

### 2. DLIF Avoidance Actions

Any proceeds of litigation on account of DLIF Avoidance Actions arising from transfers made by DLIF shall be segregated for the benefit of Class 4 to be distributed to the DLIF Investors, and all associated costs with the Avoidance Actions shall be treated as Class 4A Claims.

### C. Elimination of Intercompany Claims

With the exception of the claims allowed under the Claim Stipulation, all other Intercompany Claims shall be deemed disallowed under the terms of the Distribution Plan. Distributions on account of DLIF Investor Claims shall be distributed through Class 4B as set forth in the Distribution Plan.

### D. Class 1: Administrative Claims

Class 1 consists of the Administrative Claims which shall be paid as a first priority. It is contemplated these Administrative Claims will consist primarily of the Receiver's fees and costs and the fees and costs of professionals retained by the Receiver. All Allowed Professional Claims and Allowed Administrative Claims shall be paid up to the full amount of their Allowed Claims, as approved by the Court. No distribution will be made to Classes 3, 4 or 5 until such time as Class 1 Claims have been paid in full or sufficient reserves are held to ensure payment in full to Class 1 Claimants. Disputed Class 1 Claims will be reserved for in their full amounts unless otherwise estimated in accordance with this Distribution Plan.

### E. Class 2: Priority Claims

Class 2 consists of the Priority Claims which shall be paid in full. The Priority Claims will likely consist substantially, if not entirely, of tax claims at both the federal and state levels attributable to the sale and disbursement of assets of the estate from the QSF ("Priority Tax Claims"). The Plan does not provide any tax advice for individual claimants, and all Claimants are encouraged to consult their own tax advisor regarding any tax consequences of the Plan.

No distribution will be made to Classes 3, 4 or 5, 6 and 7 until such time as Class 2 Claims have been paid in full or sufficient reserves are held to ensure payment in full to Class 2.

**F.  Class 3: DLIFF's Allowed Claim**

Class 3 consists only of the DLIFF claim as set forth in the Claims Stipulation, which shall share *pro rata* with Class 4 claims pursuant to the terms of the Claims Stipulation. Distribution on account of Class 3 and 4 shall be made only after Classes 1 and 2 have been paid in full or sufficient reserves are held to ensure payment in full to Classes 1 and 2.[12] The funds paid to DLIFF pursuant to the Plan shall be paid to the Cayman JOLs and shall be distributed in the Cayman proceeding pursuant to Cayman law. To the extent that an advance is paid to DLIFF pursuant to the Claims Stipulation in advance of the First Interim Distribution, the amount distributed to DLIFF in the First Interim Distribution shall be adjusted to account for the amount previously paid.

**G. Class 4A: DLIF Administrative Claims**

Allowed DLIF Administrative Claims, including Allowed Professional Claims related to DLIF, shall be paid up to the full amount of such Allowed DLIF Administrative Claims from distributions made in respect of the DLIF Claim under the Claims Stipulation. Disputed Class 4A Claims will be reserved for in their full amounts from amounts that are distributed in respect of the DLIF Claim under the Claims Stipulation unless otherwise estimated in accordance with this Distribution Plan.

**H. Class 4B: DLIF's Claim**

---

[12] The Receiver has requested herein authority to make an interim distribution of $150 million to DLIF Investors and to DLIFF pursuant to the terms of the proposed Distribution Plan. Irrespective of approval of the Plan at this time, the Receiver has filed a separate motion to make an interim distribution of $10 million to DLIFF on account of its secured claim  pursuant to the Claims Stipulation.  The Receiver would reserve $22,730,414 for the benefit of the Class 4 DLIF Investors on account of their secured claim if the $10 million interim distribution to DLIFF is approved in advance of approval of the Plan.

17

Class 4B consists of the DLIF Investors who hold Allowed Claims, which shall share *pro rata* with the Class 3 Claim. Distribution on account of Class 4B shall be made only after Classes 1, 2 and 4A have been paid in full and DLIFF has received its *pro rata* distribution pursuant to the Claims Stipulation. The DLIF Investors with Allowed Claims will be treated as a single class because they are similarly situated in that the funds of the DLIF Investors were commingled in various transactions and entities. The DLIF Investor Claims will be calculated, and distributions will be made, as follows:

1.    **Claims Allowance**: DLIF Investor Claims will be calculated on the basis of their Total Investment,[13] which precludes claims for purported "profits," "interest," contractual default provisions, punitive damages, etc., as adjusted pursuant to the distribution methodology set forth herein.

2.    **Disputed DLIF Claims**: Disputed Class 4B Claims will be reserved for in their full amounts pending resolution of the dispute, unless otherwise estimated in accordance with the Distribution Plan.

3.    **Distribution Methodology**: Distributions will be made to DLIF Investors on a Rising Tide basis—that is, distributions will be made in an attempt to equalize the percentage of invested funds that are returned to each DLIF Investor without regard for whether those funds were returned by the perpetrators of the fraud pre-Receivership or paid under the Distribution Plan. This method provides for distributions to those investors who have yet to recover as much as all other investors.  Investors who previously reached a recovery percentage exceeding the new minimum recovery percentage will not receive a distribution until additional funds become available for distribution to investors and such funds are sufficient

---

[13] "Total Investment" is defined in the Plan as the total amount of cash invested by a DLIF Investor. Courts generally find that it is not equitable to include fictitious profits in the claim amount. *See, e.g. CFTC v. Equity Financial Group, LLC*, 2005 U.S. Dist. LEXIS 20001, at *77 (D.N.J. Sept. 2, 2005) ("The Court agrees that recognizing profits or other earnings in claims for distributions would be to the detriment of later investors and would therefore be inequitable.").

enough to increase their recovery percentage to the levels of those investors that have already reached a higher recovery percentage. The calculations shall be made as follows:

Step 1      Identify Aggregate Available ("A").  Aggregate Available is the ratable distribution on the DLIF Claim as set forth in the Claims Stipulation contemplated based upon an assumed  initial $150,000,000 aggregate distribution to Classes 3 and 4 under this Plan. .

Step 2      Allocate Aggregate Available between Class 3 and Class 4 pursuant to the terms of the Claims Stipulation.  With an assumed $150,000,000 initial distribution, the distribution to Class 3 would be $45,828,935 ("A1") and the distribution to Class 4 would be $104,171,065 ("A2" or "DLIF Estimated Aggregate Distribution").

Step 3      Identify Total Invested ("B").  Total Invested (total pre-Receivership subscriptions) includes all cash subscriptions and non-cash transfers paid in for investors in Class 4 during the pre-Receivership time period.

Step 4      Identify Total Returned ("C").  Total Returned (total pre-Receivership distributions) includes all cash redemptions, cash distributions, non-cash transfers and non-cash switches paid to investors in Class 4 during the pre-Receivership time period.

Step 5      Calculate Net Distribution Percentage ("D") for Class 4 Claimants.  Net Distribution Percentage represents, for investors in Class 4 each investor's Total Returned ("C") amount divided by the Total Invested ("B") amount.  The formula is $D = C / B$.  This represents each investor's pre-Receivership recovery percentage.

Step 6      The next step requires the benefit of circular or iterative calculations in order to find the equilibrium that sets a minimum recovery percentage for all investors in Class 4 such that the DLIF Estimated Aggregate Distribution amount can be distributed to only those investors in Class 4 that have Net Distribution Percentage (or pre-distribution recovery percentages) below the minimum recovery percentage and results in those same Underpaid Investors reaching the target minimum recovery percentage.  In other words, this step identifies which investors in Class 4 should receive what portion of the DLIF Estimated Aggregate Distribution such that lower paid investors are "caught up" by reaching a target minimum recovery percentage.  The following iterative sub-steps are required until an equilibrium is achieved between all calculations in this step:

Determine Underpaid Investors ("E"): Underpaid Investors are those investors in Class 4 that have a Net Distribution Percentage ("D") that is less than the Aggregate Pro Rata Percentage ("H"). Underpaid investors in Class 4 will receive an allocation of the DLIF Estimated Aggregate Distribution equal to an amount that results in a post-distribution recovery percentage that is equal to the Aggregate Pro Rata Percentage ("H").  In this case there are 771 Underpaid Investors in Class 4.

Calculate Total Invested by Underpaid Investors ("F").  Total Invested by Underpaid Investors represents the sum of the Total Invested amounts for each investor in Class 4 that is determined to be an Underpaid Investor. In this case, the result is $419,131,817.

Calculate Total Returned to Underpaid Investors ("G").  Total Returned to Underpaid Investors represents the sum of the Total Returned amounts for each investor in Class 4

19

that is determined to be an Underpaid Investor.  In this case, the result is $23,781,472.

Calculate the Aggregate Pro Rata Percentage ("H").  The Aggregate Pro Rata Percentage is equal to the contemplated DLIF Estimated Aggregate Distribution of $104,171,065 plus Total Returned to Underpaid Investors ("G") divided by Total Invested by Underpaid Investors ("F").  The formula is H = ( A + G ) / F.  This represents the new minimum recovery percentage to be achieved for all Underpaid Investors in Class 4.  In this case, the result is 30.53% after running through a series of iterative calculations.

Step 7    Calculate the Aggregate Pro Rata Distribution ("I") to investors in Class 4.  The Aggregate Pro Rata Distribution is equal to Total Invested by Underpaid Investors ("F") multiplied by the Aggregate Pro Rata Percentage ("H").  The formula is I = F x H.  This represents the amount each Underpaid Investor in Class 4 should receive in total, between the pre-Receivership recoveries and the contemplated distribution, in order to reach the minimum recovery percentage of 30.53% as calculated above.

Step 8    Calculate Underpaid Investor's Allowed Distribution ("J").  For Investors in Class 4, Underpaid Investors' Allowed Distribution amounts are equal to the Aggregate Pro Rata Distribution ("I") minus Total Returned to Underpaid Investors ("G").  The formula is J = I – G.  This amount represents for investors in Class 4 the Underpaid Investors' portion of the Total Available ("A") amount.  Once these amounts are paid, all Investors in Class 4 will have reached at least a 30.53% recovery percentage.

Calculate the Post-Distribution Recovery Percentage ("K"). The Post-Distribution Recovery Percentage is equal to Total Returned ("C") plus Underpaid Investor's Allowed Distribution ("J") divided by Total Invested ("B"). The formula is K = (C + J) / B. This represents the total recovery percentage for each investor after the contemplated initial $104,171,065 distribution to Investors in Class 4.
.

4.    **Investor Accounts**:

a.    When a DLIF Investor holds an interest in multiple accounts—which the Receiver will determine from the books and records of the Receivership Entities by matching accounts to taxpayer identification numbers ("TIN")—that DLIF Investor's claims will be aggregated for purposes of calculating the claim and allowing a distribution. Such aggregation is equitable because it treats a DLIF Investor that held multiple accounts with different Pre-Receivership Returns the same as a DLIF Investor who held a single account.

b.    For those accounts where a single TIN is used but one account is designated as a "trust" account, a retirement account or is for a separate Person,

20

and other account(s) as either a separate "trust" account, or account of another Person, the accounts will be treated as separate accounts and not be aggregated when the Receiver reasonably believes those separate accounts and associated claims represent separate interests. In such circumstance, the separate but related accounts and associated claims will not be aggregated for purposes of calculating the claim and distribution amounts for those accounts.

c.   For DLIF Investors who submitted a Proof of Claim that did not dispute the amount of their Total Investment or their Pre-Receivership Returns as reflected in Exhibit A to the Proof of Claim but instead disputed the claims allowance methodology or provided additional material, documentation, or information that did not dispute the total amount of their Total Investment or their Pre-Receivership Returns, their claims shall be deemed allowed on a Net Investment basis in Class 4B without further objection required by the Receiver.

d.   Transferee Accounts that were funded by redemption amounts transferred from a Full Transferor Account will be allowed in the Net Investment amount of the Full Transferor Account Claim. The amount of any reported profits included in the non-cash transfer will be excluded from the claim amount of the Transferee Account.

e.   Transferee Accounts that were funded from redemption amounts transferred from a Partial Transferor Account will be allowed as follows: the portion of such non-cash transfer from the Partial Transferor Account that is deemed to include reported profits (based upon a pro rata allocation of interest and profits as identified in the Partial Transferor Account) will be excluded from the Allowed Claim of the Transferee Account. The amount of profits excluded from the Claim amount of the Transferee Account will not be deemed a distribution from the Transferor Account.

f.     The Receiver is not responsible for compliance with investors' individual investment account rules and tax consequences.

5.     **Late filed Claims**: Claims filed after the Claims Bar Date will be allowed and paid on a *pro rata* basis pursuant to the Rising Tide methodology with the DLIF Investor Claims to the extent that Receiver determines that they did not timely receive notice of the Claims Bar Date. The Receiver has been unable to make contact with just two potential DLIF Investors who may submit Late Filed Claims in the future. The Distribution Plan will include the claim amounts for these two claimants and will provide for a reserve from the distribution that would otherwise be paid to Class 4B for these claimants to make distribution if and when a claim is filed. If no such claims have been filed prior to the time of final distribution, then the reserved funds shall be released and included in the final distribution made to DLIF Investors holding Allowed Claims.

## I.  Class 5: General Unsecured Creditor Claims

Allowed General Unsecured Creditor Claims will share *pro rata* with Allowed Class 6 and 7 Claims, but only after the payment or reservation in full of all holders of Class 1, 2, 3 and 4 Allowed Claims, holders of Allowed Creditor Claims shall be paid *pro rata* from the QSF, until paid in full. Current estimates are that holders of Allowed Creditor Claims will not receive a distribution.

## J.  Class 6: Indemnity Claims

Allowed Indemnity Claims will share *pro rata* with Allowed Class 5 and 7 Claims, but only after the payment or reservation in full of all holders of Class 1, 2, 3 and 4 Allowed Claims, holders of Allowed Indemnity Claims shall be paid *pro rata* from the QSF, until paid in full. Current estimates are that holders of Allowed Indemnity Claims will not receive a distribution. Additionally, the Receiver disputes each of the Indemnity Claims and anticipates filing objections, if necessary. Indemnity Claims consist of claims for indemnity by former employees, directors and officers. The Indemnity Claims are

unliquidated.  To the extent that an Indemnity Claim is Allowed and if funds are available for distribution after payment of Classes 1-4, holders of Allowed Indemnity Claims shall be paid *pro rata* along with Allowed General Unsecured Creditor Claims and Allowed Counter-Party Claims from the remaining funds in the estate until paid in full.

### K. Class 7: Counter-Party Claims

Allowed Counter-Party Claims will share *pro rata* with Allowed Class 5 and 6 Claims, but only after the payment or reservation in full of all holders of Class 1, 2, 3 and 4 Allowed Claims, holders of Allowed Counter-Party Claims shall be paid *pro rata* from the QSF, until paid in full. Current estimates are that holders of Allowed Counter-Party Claims will not receive a distribution. Additionally, the Receiver disputes each of the Counter-Party Claims and anticipates objecting to each filed Counter-Party Claim, if necessary. These Counter-Party claims include those filed by QuarterSpot, Talking Capital, and Three Line Capital, LLC (FKA Indigo Capital Markets, LLC).[14] The Receiver disputes each of the Counter-Party Claims and anticipates objecting to each filed Claim. To the extent that a Counter-Party Claim is Allowed and if funds are available for distribution after payment of Classes 1-4, holders of Allowed Counter-Party Claims shall be paid *pro rata* along with Allowed General Unsecured Creditor Claims and Allowed Indemnity Claims from the remaining funds in the estate until paid in full.


## IV.   APPROVAL OF THE DISTRIBUTION PLAN IS APPROPRIATE

### A. The Court has Broad Authority to Approve an Equitable Distribution Plan

The Court's power over an equity receivership and to determine appropriate procedures for administering a receivership is "extremely broad." *SEC v. Hardy*, 803 F.2d

---

[14]  There was a protective claim filed by Investment L, but that claim will be withdrawn under the terms of the confidential settlement with the Investment L parties, which this Court approved on November 12, 2020.  (Doc. No. 311)

1034, 1037-38 (9th Cir. 1986); *see SEC v. Basic Energy*, 273 F.3d 657, 668 (6th Cir. 2001); *SEC v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992); *SEC v. Lincoln Thrift Ass'n*, 577 F.2d 600, 606 (9th Cir. 1978) ("[T]he district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership."). This extremely broad power and broad deference stem from the long-standing principle that the full scope of a court's equity jurisdiction should be recognized and applied by the courts. *Reebok Int'l v. Marnatech Enter., Inc.*, 970 F.2d 552, 561–62 (9th Cir.1992). The primary purpose of an equity receivership is to promote the orderly and efficient administration of the estate for the benefit of the creditors. *See Hardy*, 803 F.2d at 1038. The *Hardy* court stated that it would uphold "reasonable procedures instituted by the district court" that promote the district court's orderly and efficient administration of the receivership estate for the benefit of creditors. *Id.*

The Court has wide latitude when it exercises its inherent equitable power to approve a plan of distribution of receivership funds. *SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331 (5th Cir. 2001) (affirming District Court's approval of plan of distribution because court used its discretion in "a logical way to divide the money"); *Quilling v. Trade Partners, Inc.*, 2007 WL 107669, * 1 (W.D. Mich. 2007) ("In ruling on a plan of distribution, the standard is simply that the district court must use its discretion in a logical way to divide the money" (internal quotations omitted)). In approving a plan of distribution in a receivership, "the district court, acting as a court of equity, is afforded the discretion to determine the most equitable remedy." *Forex*, 242 F.3d at 332. The Court may adopt any plan of distribution that is logical, fair, and reasonable. *SEC v. Wang*, 944 F.2d 80, 83-84 (2d Cir. 1991); *Basic Energy*, 273 F.3d at 671; *Quilling*, 2007 WL 107669 at *1; *S.E.C. v. Byers*, 637 F. Supp. 2d 166, 174 (S.D.N.Y. 2009) (internal quotation omitted) (collecting cases). *S.E.C. v. McGinn, Smith & Co., Inc.*, 2016 WL 6459795 at *2 (N.D.N.Y. Oct. 31, 2016) (internal quotations omitted).

A prima facie showing of fraud and mismanagement "is sufficient to call into play

1   the equitable powers of the court. The district court has broad powers and wide discretion

2   to frame the scope of appropriate equitable relief." *Id., citing SEC v. Keller Corp*., 323

3   F.2d 397, 403 (7th Cir. 1963) and *International Manufacturing Co. v. Landon, Inc*., 327

4   F.2d 824 (9th Cir. 1964). Yet fraud and mismanagement are not necessarily required for

5   the Court to invoke its equitable powers. *See, e.g., SEC v. Bivona*, (N.D. Cal., Sept. 13,

6   2017, No. 16-CV-01386-EMC) 2017 WL 4022485, at *6 ("Findings of wrongdoing are

7   not necessary to the distribution of Receivership Assets (under whatever plan is

8   ultimately adopted). … Thus, the Court will not reach the issue of whether Defendants

9   engaged in wrongful conduct at this time."). In *Bivona*, the court noted that it is not

10  wrongdoing that informs the court's exercise of its equitable powers over a receivership

11  entity, but the fact that there is a scarcity of assets that need to be distributed:

12          It follows that a finding of diversion of funds is not a per se
13          requirement to adopt a pro rata distribution method. That
            makes sense. What matters is whether there is a shortage
14          of assets, not necessarily the reasons for the shortage. Whether
            a shortage results from unlawful conduct does not change
15          the fact that there are insufficient funds to fully compensate
            all investors. And "when funds are limited, hard choices
16          must be made." *Official Comm. of Unsecured Creditors of
            WorldCom, Inc. v. SEC*, 467 F.3d 73, 84 (2d Cir. 2006)
17          (quotation omitted). The court, sitting in equity, must thus
            determine how to distribute the remaining funds fairly. At
18          this juncture, the reason for a purported shortfall of assets
            (i.e., whether it was caused by Defendants' alleged diversion
19          of funds or violation of the securities laws) does not appear
            to be material to the fairness analysis for the distribution
20          method.

21  *Id.*, 2017 WL 4022485, at *9.

22          **B. Mission to Achieve Fairness Among Investors Guides Court's**

23              **Application of Power.**

24          Once the Court's equitable power over a receivership has been invoked, the court

25  will seek to treat all investors equally, an approach captured in the axiom "equality is

26  equity" from the original Ponzi scheme case. *Cunningham v. Brown*, 265 U.S. 1, 13

27  (1924); *see also SEC v. Capital Consultants, LLC*, 397 F.3d 733, 739 (9th Cir. 2005)

28

(quoting *United States v. Real Property Located at 13328 and 13324 State Highway 75 North*, 89 F.3d 551 (9th Cir.1996). Because there are multiple competing interests for a limited pot of money, the type of distribution plan that is adopted may have differing impacts on different class of creditors. When it comes to dividing up the funds available for the DLIF Investors in Class 4, those claimants will fair differently under different distribution models. While some may want to try to separately trace their funds that were put in right at the end in an attempt to get priority treatment, others may want the Receiver to honor the account statements that they received showing artificially inflated net asset values for their accounts. Others may receive a larger distribution under a more traditional Net Investment methodology (discussed below), while others may prefer the equitable model of Rising Tide (also discussed below). The Receiver has run models of what the distribution for Class 4 will look like under the Last Statement method, the Net Investment method, and the Rising Tide method, a draft summary of which is set forth in Exhibit "4" attached to the Sharp Declaration.[15] For the reasons set forth herein, the Receiver has concluded that Rising Tide is the most equitable distribution model that will benefit the vast majority of the DLIF Investors.

### 1.  Tracing for Certain DLIF Investors is Not Equitable

As a threshold matter, the Receiver does not believe that it is appropriate to permit a few investors in DLIF to try to trace their funds in an attempt to receive payment in full ahead of other DLIF Investors. Courts reject tracing in favor of *pro rata* distributions because "it would be inequitable to allow those claimants who are able to trace their funds

---

[15] The numbers in Exhibit "4" are subject to change and the model does not yet take into account the TIN consolidation or noncash redemption transactions, for which the Receiver will adjust after the Distribution Plan is approved.  The particular claim amounts are subject to change upon approval of the Distribution Plan and will be updated to make certain claim adjustments, including but not limited to (a) reported profits included in non-cash transfers to investor accounts that were funded from redemptions transferred from other investor accounts (no such adjustments have been made in this analysis); and (b) aggregation of DLIF Investors' claims with the same TIN that might be subsequently identified outside this analysis.

to recover at the expense of other similarly situated claimants when such claimants are only able to trace their assets as a result of the 'fortuitous fact that the defrauders spent the money of other victims first.'" *Commodity Futures Trading Com'n v. Equity Financial Group, Inc.* (D.N.J., Sept. 2, 2005, No. CIV.04-1512 RBK AMD) 2005 WL 2143975, at *24 (quoting *United States v. Durham*, 86 F.3d 70 (5th Cir.1996)); *S.E.C. v. Quan*, 870 F.3d 754, 762 (8th Cir. 2017) ("Courts have 'routinely endorsed' the *pro rata* distribution of assets to investors as the most fair and equitable approach in fraud cases.") (collecting cases); *S.E.C. v. Wealth Mgmt. LLC*, 628 F.3d 323, 333 (7th Cir. 2010); *S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88 (2d Cir. 2002). The fact that some investors can trace their losses is generally not a reason, by itself, to depart from a *pro rata* distribution, because courts must avoid favoring some similarly situated investors over others. *See U.S. v. Wilson*, 659 F.3d 947, 956 (9th Cir. 2011); *Bivona*, 2017 WL 4022485 at *7-8.

In an effort to treat investors fairly and equally, the courts routinely reject objections by investors that the investors are able to trace their investments and connect them with specific returns, and that therefore, the investors should receive their principal and alleged profits, or even just their principal. *See Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd.,* 205 F.3d 1107, 1115-16 (9th Cir. 2000). Courts "will not indulge in tracing when doing so would allow one fraud victim to recover all of his losses at the expense of other victims." *Wilson*, 659 F. 3d at 956. *See also Byers*, 637 F. Supp. 2d at 177 ("Tracing analysis … has been almost universally rejected by courts as inequitable."); *Bivona*, 2017 U.S. Dist. LEXIS 148575, at *12 (declining to "trace" investor funds because such funds were "regularly commingled" among the various entities, including using one entity's funds to cover obligations of other entities and funding one entity's investments with another entity's funds).

## 2.  Modeling for Different Distribution Methodologies

Every distribution methodology is imperfect and will likely leave some of the DLIF

Investors displeased with the choice of methodology, as the selection of the particular distribution methodology will have a direct impact on the amount of distributions to be received by the DLIF Investors. The Receiver has carefully weighed all alternatives and has analyzed how different DLIF Investors will be impacted differently depending on which model is used. He has also looked at the total number of investors to be benefited by each method. For purposes of analyzing the most equitable distribution plan for DLIF Investors, the Receiver has modeled the three principal distribution methodologies (Net Investment, Rising Tide, and Last Statement) based on an assumed total distribution of $150 million held in the QSF and the other terms of the proposed Distribution Plan.[16]

Each of the models and the impact on the DLIF Investors is summarized as follows and discussed in more detail below. The Rising Tide method endeavors to equalize the percentage of invested funds that are returned to each investor by considering both the amounts paid to the investors pre-Receivership and the amount to be distributed from the Receivership. The Net Investment method seeks to allocate receivership distributions *pro rata* based on the net amount of the claim after consideration of the money invested and the money distributed pre-receivership. The Last Statement Method seeks allowance of claims based upon the amounts identified on the last statement generated for the customer's account. The Last Statement method has not been widely adopted but is preferred by investors who have accumulated profits on their statements and who wish to be paid those expected profits.

---

[16] See Exhibit "4" attached to the Sharp Declaration for a summary of the modeling. The Receiver notes that these models are illustrative. The ultimate distributions could differ if the Court, for example, determines material provisions of the Receiver's proposed Plan should be revised, the amounts available for distribution are greater or less than assumed in the models based on the monetization of assets and the completion of litigation, or further information changes the extent to which accounts were aggregated in the models. The figures supplied in the models reflect the Receiver's reasonable efforts to provide the Court and DLIF Investors an adequate basis to address whether the Rising Tide method is equitable under the circumstances of this case. Despite these reasonable efforts, figures provided in this section remain preliminary and subject to change and should be treated as illustrative rather than predictive.

The Net Investment method does not seek to equalize percentage returns based upon funds paid pre-Receivership and in consideration of funds that will be paid from the Receivership. The Last Statement method does not differentiate between those investors who received distributions during the fraudulent operations and those who received nothing or relatively little during that same period. The Last Statement method is detrimental to those fraud victims who received little or nothing prior to the receivership because they must split limited receivership assets with those investors who already benefited from their pre-Receivership receipt of other fraud victims' money.

Courts balance the equities in the particular case when considering distribution methodologies. *CFTC v. Barki*, LLC, 2009 U.S. Dist. LEXIS 112998(W.D.N.C. Nov. 12, 2009). The *Barki* court noted that "Although all three methods are equitable, the facts of a given case dictate which method would be most equitable. *See, e.g., SEC. v. Byers*, 637 F. Supp. 2d at 182. For example, in *Byers*, the court rejected the Rising Tide method when 45% of the investors would receive no additional compensation.

On the other hand, in *CFTC v. Lake Shore Asset Management. Ltd*., 2010 U.S. Dist. LEXIS 24061, at *28 (N.D. Ill. Mar. 15, 2010) (citing Eq*uity Financial*, 2005 U.S. Dist. LEXIS 20001, at *83), the court found that the Rising Tide method was the most equitable method:

> [I]t prevents an investor who previously received funds as withdrawals from "benefitting at the expense of other investors by retaining the benefit of the full amount of his withdrawal *plus* a distribution calculated on the basis of net funds invested, rather than the recommended distribution amount adjusted to take into account all amounts already received.

The Receiver has concluded that Rising Tide is the most equitable distribution model in the aftermath of the fraud. For summary purposes, the modeling reflects that the following number of investor accounts will receive the greatest distribution under each of the models:

Rising Tide:          592

29

1    Net Investment:    94

2    Last Statement:    228

3        The most common types of *pro rata* distribution plans use either a Rising Tide or

4    Net Investment method to calculate each investor's distribution. The unifying thread

5    through the cases examining the receivership distribution plans of district courts is that

6    the courts seek to be fair and equitable to similarly situated creditors, and *pro rata*

7    distribution through a Rising Tide or Net Investment method is widely preferred over

8    methods that might provide a greater recovery to some creditors at the expense of other

9    creditors. This principle was well-articulated in *SEC v. Elliott*:

10            To allow any individual to elevate his position over that of
              other investors similarly victimized by asserting claims for
11           restitution and/or reclamation of specific assets based upon
             equitable    theories    of    relief    such    as    fraud,
12           misrepresentation, theft, etc. would create inequitable
             results, in that certain investors would recoup 100% of their
13           investment while others would receive substantially less."

14   *S.E.C. v. Elliott* (11th Cir. 1992) 953 F.2d 1560, 1569.

15       The Receiver believes that the Rising Tide *pro rata* plan is more equitable in this

16   case for at least the following reasons. First, only 94 investors will benefit from the

17   selection of the Net Investment method over Rising Tide. Rising Tide will benefit 604

18   investors the most. Additionally, the Net Investment method does not equalize

19   distribution based on amounts previously distributed to investors pre-Receivership.

20   Rather, this method simply adjusts the allowed amount of the claim on a cash in and cash

21   out basis and then distributes to the investors with allowed claims on a *pro rata* basis,

22   without consideration to the percentage of the claim that has been repaid.

23       Given that some DLIF Investors fare better under one methodology than another,

24   some parties may object to the methodology selected. The Receiver must look at the

25   overall equity in the case and cannot allow a particular individual's or small group of

26   individuals' interests drive the analysis. Rather, the Receiver and this Court must

27   simultaneously consider the interests of all DLIF Investors and other claimants to derive

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF RECEIVER FOR APPROVAL
OF: DISTRIBUTION PLAN; RISING TIDE DISTRIBUTION METHODOLOGY WITH RESPECT TO DLIF
INVESTOR CLAIMS; PROPOSED INTERIM DISTRIBUTION; AND NOTICE OF DISTRIBUTION PLAN

an equitable distribution plan, consistent with the satisfaction of due process and individual property rights. The Receiver has carefully weighed all alternatives and has analyzed how different investors will be impacted differently depending on which model is used. He has also looked at the total number of investors to be benefited by each method and has concluded that Rising Tide is the most equitable distribution model for distribution to DLIF Investors in the aftermath of the fraud. The Receiver believes that the proposed Distribution Plan is the most fair and equitable plan for the resolution and treatment of such Investors and Claimants and he asks the Court to view the proposed Distribution Plan as a whole and to approve the Plan in its entirety.

### 3.  The Last Statement Method is Not Equitable

One method of distribution that is not often used in equitable receiverships is the "Last Statement" method – which is when an investor's distribution is based on the value listed on an investor's last account statement. The Last Statement method seeks allowance of claims based upon the amounts identified on the last statement generated on the customer's account books. *CFTC v. Richwell Int'l, Ltd.*, 163 B.R. 161 (N.D. Cal. 1994); *see also SEC v. AmeriFirst Funding,* 2008 U.S. Dist. LEXIS 20044, at *17 (declining to adopt the Last Statement method, noting that "treating the pre-receivership interest payments as a return of investments is the best way of putting those investors who elected to receive interest payments on equal footing with those who elected to rollover their interest").

The Last Statement method is not equitable when those statements do not reflect reality or are otherwise inaccurate. *See, e.g., In re Bernard L. Madoff Investment Securities, LLC,* (S.D.N.Y., Jan. 14, 2016, No. 15 CIV. 1151 (PAE)) 2016 WL 183492, at *1. As set forth in the Report attached as Exhibit "1," the net asset values reflected in the investors' statements are not reliable or accurate as they were overstated by hundreds of millions of dollars.

The Receiver's claims modeling in Exhibit "4" reflects that 231 DLIF Investors

could likely prefer a methodology that allows their claim in the amount set forth in their

last statement, which was based on the inflated NAVs issues as of November 31, 2018.

The Report sets forth the background revealing that the November 2018 NAVs were

substantially inflated, as were NAVs for prior periods when DLIF Investors entered,

and exited, the scheme over time. The facts of this case do not warrant analysis of the

priorities of distribution on a breach of contract, or benefit of the bargain basis. In an

ordinary breach of contract case involving a promissory note, the creditor has claims

beyond recovering the outstanding loan principal, including for interest, default interest,

attorney fees, and other costs. In the case of a fraudulent scheme where account

statements were based on fictitious returns and the promoter of the scheme made the

same misrepresentations to all investors, equitable considerations must supersede any

ordinary contract claim. Here, the Receiver has concluded that equity and the collective

interests of DLIF Investors are best served by precluding "benefit of the bargain"

recoveries because the use of the NAVs as a benchmark for valuing claims is therefore

unreliable and unjust.

The fraud perpetrated on the DLIF Investors who were similarly situated and held

interests in all of the same assets necessitates that the distribution plan be based upon

equitable considerations. The Ninth Circuit has recognized that equity can displace an

investor's claim to "benefit of the bargain" recoveries. *See In re Tedlock Cattle

Company, Inc.,* 552 F.2d 1351 (9th Cir. 1977). There, when a Ponzi scheme involving

cattle feedlots collapsed, early investors contended that their fraud claims entitled them

to "benefit-of-the-bargain" damages. *Id*. at 1352. The Ninth Circuit affirmed the

rejection of that argument, finding that false profits paid out to earlier investors as a

return of principal would "unfairly" reduce and defeat claims of later investors who had

received none of their principal back. *Id*. at 1353. Instead, equity allowed the receiver in

that case to craft a formula for investor claims that relied on how much money each

investor paid in and received back. *Id*. at 1352, 1354.

District courts are empowered to fashion remedies and approve distribution plans that are arguably inequitable to individual investors when they serve the goal of protecting the body of investors as a whole. For example, in *SEC v Capital Consultants*, the Ninth Circuit upheld a plan that reduced individual investors' ultimate *pro rata* distributions by 50% of sums that those investors had recovered from third parties who originally advised the investors to invest in the receivership entity. *Id.*, 397 F.3d at 739.

District courts are not necessarily hemmed in by the existence of state law claims that investors might have; when they are exercising equitable power to distribute insufficient assets to creditors, the courts strive to avoid providing relief to one creditor at the expense of another. This is true even if one creditor has a valid legal claim. *See Liberte Capital Group, LLC v. Capwill,* 148 Fed.Appx. 426, 434 (6th Cir. 2005). In *Liberte Capital*, investors were matched directly with specific life insurance policies. The district court did not permit tracing of the investments, even though tracing would have been simple in many instances. *Id.* In its opinion approving the distribution plan, the Sixth Circuit observed that the investors "may well be the actual beneficiaries, and their ownership interest easily ascertained. Furthermore, they may well have valid legal claims, including breach of contract and fraud. However, a court sitting in equity has the discretionary authority to deny state law remedies as inimical to the receivership." *Id,* citing *United States v. Vanguard Inv. Co.,* 6 F.3d 222, 226 (4th Cir.1993); *SEC v. Elliott,* 953 F.2d 1560, 1569–70 (11th Cir.1992). In another case, a Central District of California district court acknowledged that 700 investors had their own state law claims, but refused to allow them to intervene in the receivership on multiple grounds, including that the intervention would delay the ultimate distributions to investors because of increased discovery and a more extensive trial process, which would hurt all of the investors. *SEC. v. TLC Investments and Trade Co.,* 147 F.Supp.2d 1031, 1043 (C.D. Cal. 2001).

### 4.  A Net Investment Plan is Not the Most Equitable

Rather than benefit of the bargain, courts frequently favor a *pro rata* distribution of funds in equitable receiverships. *See S.E.C. v. Quan*, 870 F.3d 754, 762 (8th Cir. 2017) ("Courts have 'routinely endorsed' the pro rata distribution of assets to investors as the most fair and equitable approach in fraud cases.") (collecting cases). The Net Investment method has been used as the basis of *pro rata* plans of distribution in some fraud cases. *See, e.g.*, *CFTC v. CapitalStreet Financial, LLC*, 2010 U.S. Dist. LEXIS 75113, at *7 (W.D.N.C. June 18, 2010) ("The distribution method for Investors will be the 'Net Investment' method. Investors shall receive a pro rata share of the Receivership Estate based upon each Investor's Net Investment. The Net Investment for each Investor shall be calculated by subtracting that Investor's Total Withdrawals from Total Investment[.]"); *see also SEC v. Byers*, 637 F. Supp. 2d 166, 172 (S.D.N.Y. 2009) (holding that claims to be calculated on "net investor method" which means that any cash distributions received prior to the insolvency proceeding would be subtracted from the total amount invested); *SEC v. Credit Bancorp, Ltd.*, 2000 U.S. Dist. LEXIS 17171, at *97 (S.D.N.Y. Nov. 29, 2009) (holding that a "net investment" method was appropriate, where the distribution plan provided that "a customer's claim is limited to the principal balance deposited with Credit Bancorp and is reduced by the amount of any funds previously received including prepaid or quarterly custodial dividends, loans, or other distributions. In addition, customers may not assert claims for interest, dividends, or promised returns").

Courts generally consider three factors when determining whether to approve a *pro rata* distribution plan: (1) Was there a single, unified scheme to commit fraud? (2) Were the defrauded victims similarly situated? and (3) Have funds been commingled across multiple accounts? *See Credit Bancorp, Ltd.*, 290 F.3d at 88-89; *S.E.C. v. J.P. Morgan Sec., LLC*, 266 F. Supp. 3d 225, 231 (D.D.C. 2017); *S.E.C. v. Founding Partners Capital Mgmt.*, Case No. 2:09-cv-229-FTM-29SPC, 2014 WL 2993780 at *6 (M.D. Fla. July 3, 2014).

The Report clearly establishes the basis for an equitable *pro rata* distribution plan. For the reasons set forth herein, the Receiver believes that a Rising Tide Plan is more equitable than a Net Investment plan.

### 5.  Rising Tide Method of Distribution is the Most Equitable

The type of *pro rata* distribution method that is "most commonly used (and judicially approved) for apportioning receivership assets" is known as the "Rising Tide" method. *S.E.C. v. Huber*, 702 F.3d 903, 906 (7th Cir. 2012). The Rising Tide method takes into consideration not only how much a person invested in the scheme but also what percentage of their investment was returned to them before the Receiver was appointed. *See, e.g. CFTC v. Rust Rare Coin*, 2020 U.S. Dist. LEXI 152245 (D. Utah Aug. 20, 2020). Courts have noted that, "there is no reason to allow certain investors to receive different percentages of their initial investment given that all of the investors were all equally victimized by the conduct of the Receivership Defendants." *CFTC v. Lake Shore Asset Management. Ltd*., 2010 U.S. Dist. LEXIS 24061, at *28 (N.D. Ill. Mar. 15, 2010).

The *Lake Shore* court further noted that "because the 'Rising Tide' method benefits over 85% of the approved claimants and 13% of the claimants would benefit under the application of the 'Net Investment' method but receive more than their fair share of the available funds, the court approves the use of the 'Rising Tide' method." *Lake Shore* at *29.

The Receiver has concluded that the Rising Tide methodology of distribution for distribution is the most equitable manner in which to treat the DLIF Investors. The Receiver's conclusions regarding the appropriate distribution methodology are based primarily on the fraudulent nature of the scheme from inception and the fact that all investors are similarly situated and were invested in the same pool of assets. Additionally, 64.8% of the DLIF Investors will benefit from the Rising Tide method of distribution, as opposed to 10.3% for Net Investment and 24.9% for Last Statement. The Receiver believes it is most equitable for all investors to ultimately receive a distribution equal to

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF RECEIVER FOR APPROVAL OF: DISTRIBUTION PLAN; RISING TIDE DISTRIBUTION METHODOLOGY WITH RESPECT TO DLIF INVESTOR CLAIMS; PROPOSED INTERIM DISTRIBUTION; AND NOTICE OF DISTRIBUTION PLAN

the same percentage of their cumulative investment, irrespective of whether the distribution was made directly from the investment scheme or by a receiver from the assets remaining in the receivership estate.

The manner in which Rising Tide calculations are made has been described as follows: distributions are "calculated according to the following formula: (actual dollars invested x *pro rata* multiplier) - withdrawals previously received = distribution amount."[17]

In *Parish*, the court described the Rising Tide Method as follows:

> In effect, an individual investor's loss is deemed to be the gross amount actually invested in the scheme. Payments received by the investor prior to the scheme's collapse are treated as "distributions" on par with the distributions to be made by the Receiver, so that prior amounts paid by Parish are credited against (i.e., subtracted from) the amount that would otherwise be paid from the receivership estate. Under this method, investors who received prior payments are entitled to receive a smaller *pro-rata* payment from the receivership estate than those who received no prior payment. Moreover, investors who previously received payments exceeding their *pro rata* amount of the total distribution will receive no distribution from the receivership estate.[18]

In *United States v. Cabe*, the court used this articulation of the method, although it did not call it the "Rising Tide Method":

> The court further finds that persons who have previously been repaid by defendants should not be wholly barred from participating in the distribution. Rather, such persons should receive a reduced amount so that the total amount they receive (both from the distribution and from the earlier repayment from the defendants) would roughly equal the

---

[17] *Equity Financial*, 2005 U.S. Dist. LEXIS 20001, at *83.

[18] *SEC v. Parish*. No. 2:07-cv-00919-DCN, 2010 U.S. Dist. LEXIS 11757 (D.S.C. Feb. 10, 2010), at *11.

36

amount they would have received from a pro rata distribution had they not received any money during the scheme from the defendants.[19]

In *CFTC v. Hoffberg*, the court used this formula, with explanation, although it too did not call its method the "Rising Tide Method":

(Total Investment x 0.15) - Amounts Previously Received

The "Amounts Previously Received" reflects all monies received by the investors, whether withdrawn from the account by the investor or distributed to the investor by Hoffberg. The result of this formula is that investors who had withdrawn or otherwise received back more than 15% of their initial investment will recover no additional amounts at this time.[20]

The Report lays the foundation for his recommended Distribution Plan based on the Rising Tide method of distribution for the DLIF Investors. Under the Rising Tide method, distributions will be made to the DLIF Investors with the purpose of equalizing the percentage of invested funds that are returned to each DLIF Investors without regard for whether the funds were returned pre-Receivership to the DLIF Investor by the Receivership Entities or as part of the Receiver's Distribution Plan. Under the Rising Tide method, assets are distributed to the extent they are available to those investors who lost the greatest percentage of their investment until they reach parity with other investors who lost a smaller percentage of their investment due to distributions made during the course of the fraudulent scheme before the appointment of a receiver.

The mechanics of the Rising Tide method were explained in a recent receivership case as follows:

---

[19] *United States v. Cabe*, 311 F. Supp. 2d 501, 509 (D.S.C. 2003).

[20] *CFTC v. Hoffberg*, 1993 U.S. Dist. LEXIS 15173, at *4 (N.D. Ill. Oct. 28, 1993) (footnote omitted).

| Investor | Adjusted Investor Claim | Pre-Receivership Recovery | Percentage return |
|---|---|---|---|
| A | $100,000 | $0.00 | 0% |
| B | $200,000 | $40,000.00 | 20% |
| C | $100,000 | $80,000.00 | 80% |

Under this scenario, Investor A would be the first to receive a distribution, as their percentage return is 0%. Investor B will not receive a distribution unless and until Investor A has received a 20% percentage return or, in this illustration, distributions of $20,000.00. In the event Investor A receives $20,000.00 in distributions and there remain additional funds to distribute, Investor B will begin receiving distributions with Investor A proportionate to their Allowed Claims. Based on the above illustration, in the event there is an additional $6,000.00 to distribute, Investor A would receive $2,000.00, and Investor B would receive $4,000.00 (an additional 2% return to each Investor). Investors A and B will continue to receive distributions to the exclusion of Investor C until Investors A and B have both received an 80% percentage return. In the event Investors A and B receive distributions sufficient for both to receive an 80% percentage return and there remain additional funds to distribute, Investor C will begin receiving distributions with Investors A and B proportionate to their Allowed Claims.

*Rust Rare Coin*, 2020 U.S. Dist. LEXIS 152245, at *5-6.

The Rising Tide distribution to a given DLIF Investor is the sum of Pre-Receivership Returns, plus the amount that the Receiver will distribute pursuant to the Distribution Plan. The Rising Tide distribution divided by Total Investment equals the Rising Tide recovery percentage (i.e., the Recovery Threshold) for a given DLIF Investor. Each Allowed DLIF Investor Claim will be paid up to the Recovery Threshold based on the ratio of the Pre-Receivership Return received by a given DLIF Investor to such DLIF Investor's related Total Investment. If the DLIF Investor received Pre-Receivership Returns that exceed the final Rising Tide *Recovery Threshold*, the DLIF Investor will not receive a further distribution, unless and until all other Allowed DLIF Investors Claims

38

are paid the same rising tide Recovery Threshold and there are additional sums to distribute to DLIF Investors.

As modeled in Exhibit "4," the Rising Tide distributions (including Pre-Receivership Returns and distributions that would be made under the Distribution Plan) reach approximately at least 30.53% for all DLIF Investors assuming a $150 million distribution. That is, DLIF Investors who received Pre-Receivership Returns from the Receivership Entities of less than 30.53% of their Total Investment would receive distributions from the Receivership such that their cumulative distributions would equal approximately 30.53% of their Total Investment. Under a Rising Tide methodology, this recovery percentage, or "Recovery Threshold," would be uniform across DLIF Investors who receive funds under the Distribution Plan. Under the Rising Tide method, DLIF Investors who lost the greatest percentage of their Total Investment receive a proportionately greater distribution from the Receivership Property than DLIF Investors who already received proportionally larger returns as a result of Pre-Receivership Returns. Stated differently, the Rising Tide method equalizes distributions to all DLIF Investors, including those DLIF Investors who received disproportionate distributions from the Receivership Entities (made with later DLIF Investors' money); those DLIF Investors who received payments from the Receivership Entities do not benefit at the expense of those who did not.[21]

## V.    ASSETS MAY BE POOLED FOR DISTRIBUTION

The Receivership Entities and their assets were substantially commingled and the assets of the Receivership Entities shall be pooled for distribution under the Distribution Plan to the extent set forth in the Distribution Plan. The commingling of assets of the

---

[21] *See e.g.*, *Huber*, 702 F.3d at 909 (approving use of "rising tide" distribution plan); *CFTC v. Hojjberg*, No. 93-cv-3106, 1993 WL 441984, at *3 (N.D. Ill. Oct. 28, 1993) (adopting a "rising tide" plan); *CFTC v. Equity Financial Group, LLC*, No. 04-1512, 2005 WL 2143975, at *25 (D.N.J. Sept. 2, 2005) (same).

Receivership Entities provides sufficient basis to combine and pool all assets of the Receivership Estate for purposes of distribution as set forth in the Distribution Plan. As set forth in the Report, there is no factual basis for any particular creditor to trace its funds and, in any event, tracing is disfavored "when doing to would allow one fraud victim to recover all of his losses at the expense of the other victims." *United States v. Wilson*, 659 F.3d 947, 956 (9th Cir. 2011). *See also United States v. Real Prop. Located at 13328 & 13324 State Highway 75 N.*, *Blaine Cty., Idaho*, 89 F.3d 551, 553 (9th Cir. 1996) ("tracing fictions should not be utilized under circumstances involving multiple victims and commingled funds"). Typically, tracing of invested funds does not yield the most equitable result, because the ability to trace funds is the result of the merely fortuitous fact that certain investor funds were spent before funds of others, where the funds of investors have been shown to be substantially commingled. *SEC v. Sunwest Management, Inc.* (D. Or., Oct. 2, 2009, No. CIV. 09-6056-HO) 2009 WL 3245879, at *8–9, *citing United States v. Durham*, 86 F.3d 70 (5th Cir.1996).

To justify pooling, "[c]ommingling need not necessarily be systematic." *SEC v. Sunwest Mgmt.*, No. 09-6056-HO, 2009 U.S. Dist. LEXIS 93181, at *34 (D. Or. Oct. 1, 2009) (citing *Eustace*, 2008 U.S. Dist. LEXIS 11810). There is no predetermined amount of commingling required to justify the pooling of assets. "[C]ourts have held that *any* commingling is enough to warrant treating all the funds as tainted." *Sunwest*, 2009 U.S. Dist. LEXIS 93181 at *34 (emphasis added) (("Due to the fungibility of money . . . courts have held that any commingling is enough to warrant treating all of the funds as tainted."); *SEC v. Byers*, 637 F. Supp. 2d 166, 178 (S.D.N.Y. 2009) (finding "some evidence that commingling occurred" supported a *pro rata* distribution, and noting "the law does not appear to require more than that").  "[E]ven the 'presence of some tainted funds in [a] commingled account is sufficient to taint' legitimately-acquired funds …." *Bivona*, 2017 U.S. Dist. LEXIS 148575, at *27.

In evaluating the commingling of assets and whether pooling is appropriate, the purpose is to determine whether "the source and destination of each investor's funds can be meaningfully disentangled." *Id.* This principle flows from the fact that money is fungible and, once moneys are combined, disaggregation is somewhat arbitrary and disentanglement challenging. Thus, even the "presence of some tainted funds in [a] commingled account is sufficient to taint" legitimately-acquired funds in the context of money laundering. *United States v. Garcia*, 37 F.3d 1359, 1365-66 (9th Cir. 1994).

## VI.     SUBORDINATION OF CLAIMS

The Distribution Plan provides that Class 5, 6 and 7 claims will only receive distribution following payment in full to Class 1, 2, 3 and 4 claimants. Class 5 is composed of General Unsecured Claims arising out of or relating to any: contract, lease, or other agreement entered into prior to April 1, 2019, for which payment has not been made in whole or in part, or for which payment has or will come due prior to, on, or after April 1, 2019; good or services provided prior to April 1, 2019; unpaid employee wages, compensation, or other employment benefits, that accrued prior to April 1, 2019; or taxes payable by the Receivership Entity for tax period prior to April 1, 2019 (some of which may be classified as Class 2 Priority Claims).

All of these the classes properly should be classified as, at most, unsecured claims. It is common for distribution plans to prioritize the claims of innocent investors in a fraudulent scheme over other non-secured creditors. *See, e.g.*, *United States CFTC v. Capitalstreet Fin., LLC*, No. 3:09cv387-RJC-DCK, 2010 U.S. Dist. LEXIS 75113, at *4 (W.D.N.C. June 18, 2010) (approving plan giving investors priority over creditors); *SEC v. HKW Trading LLC*, No. 8:05-cv- 1076-T-24-TBM, 2009 U.S. Dist. LEXIS 77215, at *8 (M.D. Fla. Aug. 14, 2009) ("Payment to claimants whose property was unlawfully taken from them is given a higher priority than payment to the general creditors." (Citing Clark, TREATISE ON THE LAW AND PRACTICE OF RECEIVERS § 662.1(a), p.

41

1174, § 667, p. 1198 (3d ed. 1959)); *SEC v. Brian A. Bjork*, No. 4:11-cv-2830 (S.D. Tex.
2013).

    Class 6 is composed of the unliquidated Indemnity Claims of former employees,
officers, or directors of the Receivership Entities in connection with an employment
contract entered into prior to April 1, 2019. The Receiver disputes the Claims filed by
each claimant in this Class and anticipates filing objections if the Receiver is unable to
reach a compromise resolution with the Claimants, which could include a broader
settlement of potential claims. The former employees, officers or directors that have filed
Indemnity Claims include the Chief Investment Officer, the Chief Financial Officer,
General Counsel, EVP, Research, and EVP Sales. With one limited exception,[22] the sole
reason that these individuals may have Indemnity Claims is if *in the future* they suffer
losses not covered by insurance, which is only a possibility if they are found liable for
damages in excess of the available insurance coverage remaining from $35 million in
Directors & Officers insurance. They then could theoretically assert that they are entitled
to indemnity from the Receivership Entities based on pre-receivership employment
contracts or certain entities' organizational documents.  Second, not only will these all
remain unliquidated claims for the foreseeable future, but even if any of the Class 6
Claimants suffered a loss in a sum in excess of insurance coverage, the loss almost
certainly would be based on a judgment of wrongdoing, which would result in the claims
being disallowed because such wrongdoing was against the Receivership Entities and the
claimants should be barred from pursuing indemnity claims as a result. Thus, the Receiver
believes such claims would then be disallowed on that basis in any event.

---

[22] One former officer of DLI has incurred legal expenses that he attributes to a need
to protect against future claims that theoretically could arise against him, from
responding to future requests for interviews by governmental authorities, and for
monitoring these proceedings.  He has been denied coverage by the insurers because
they have determined that no claim has been made against him and no request for an
interview has been made by a governmental authority that the insurers view as
triggering coverage.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF RECEIVER FOR APPROVAL
OF: DISTRIBUTION PLAN; RISING TIDE DISTRIBUTION METHODOLOGY WITH RESPECT TO DLIF
INVESTOR CLAIMS; PROPOSED INTERIM DISTRIBUTION; AND NOTICE OF DISTRIBUTION PLAN

In this context, it is important to note that treating the Indemnity Claims as pre-receivership unsecured claims is proper. In *In re Christian Life Center*, 821 F. 2d 1370 (9th Cir. 1987), a group of lawyers representing corporate officers of a chapter 11 debtor in an adversary proceeding sought administrative expense priority for their attorney's fees. The Ninth Circuit squarely held that claims for indemnification of legal costs incurred by an officer of the debtor who was sued arose based on alleged pre-petition misconduct by the officers arose, as here, from pre-petition contracts. Thus, any duty of the debtor to reimburse or indemnify the officer for his legal expenses was, at most, a general unsecured claim.[23]

In addition, the Ninth Circuit noted that, "[i]t is beyond cavil that the court could subordinate indemnity claims of officers found liable of securities violations or fraud" to all other unsecured creditors.  The Ninth Circuit remanded the case back to the bankruptcy court so that there could be a more developed record to rule on whether the officers could prevail on the merits of their defense in the adversary proceeding or if the bankruptcy court had sufficient grounds to find that the officers had acted wrongfully or inequitably (citing to Cal. Corp. Code 317).

Similarly, in *SEC v. Francisco Illarramendi*, 2014 U.S. Dist. LEXIS 16459 (D. Conn. Feb. 14, 2014), former officers sought an order from the district court in a

---

[23]  There are many other cases that reach similar results.  For example, in *State Com'r of Social Services v. 3030 Park Fairfield Health Center, Inc.* 2006 WL 3360589 (Conn. Nov. 2, 2006), a former officer of a corporation that was put into receivership by the state filed a proof of claim in an unliquidated amount for indemnification of any payments and expenses pursuant to Connecticut's mandatory  indemnification provision. Creditors (post receivership) had threatened litigation against her for alleged acts committed while she was an officer of the corporation. The officer argued that her claim was entitled to administrative priority because claims had arisen after the commencement of the receivership and some of the lawsuits had not been instituted yet.  The court turned to bankruptcy law to find that the claims concerned pre-petition activities and therefore did not satisfy 11 U.S.C. § 503 of the Bankruptcy Code, which defines an administrative expense as "the actual, necessary costs and expenses of preserving the estate…" Thus, the Court held that the officer's claims were to be treated as pre-petition unsecured claims citing numerous cases, including *In re Christian Life Center*, 821 F.2d at 1373, and *Trustees of Amalgamated Zins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986)

43

receivership action for advancement of legal fees to defend against a suit brought by the receiver. The movant's liability had not yet been determined and the movant's contractual rights to indemnification and advancement were derived from Delaware law. The receiver argued that the advancements should be rejected as they were not administrative expenses. The officers argued that Delaware's strong policy favoring indemnification justified administrative expense priority. The court held that the advancement of attorneys' fees could be considered an administrative expense. However, relying on Delaware cases, the court held that an evidentiary hearing was needed to determine whether the movants had unclean hands or engaged in inequitable conduct because under Delaware law even when advancement is contractually required indemnity should be denied because the officers had unclean hands or engaged in inequitable conduct. This outcome is consistent with the general principles of indemnity law, which bar indemnity claims of former officers and directors who have engaged in wrongdoing.

In sum, subordination of the Indemnity Claims is warranted because they are at most general unsecured claims; they are unliquidated claims that almost certainly will not arise absent a finding of liability; and even if there is a finding of liability such a finding would justify disallowing the claims in their entirety. At a minimum, claims of former officers and directors found culpable should be subordinated.

Class 7 is composed of the three Claims filed by Counter-Parties against the Receivership Estate arising from or relating to the failure to lend money post-Receivership in connection with contracts entered into prior to April 1, 2019. The Receiver disputes claims in this Class as well and anticipates filing objections. The Distribution Plan provides that to the extent claims in Class 6 and Class 7 are Allowed, they will only be paid after payment is made in full to Classes 1-4, and will be paid *pro rata* with the Class 5 claims.

More specifically, as to the claim of Counter-Party Talking Capital, the Receiver contends that this Counter-Party engaged in wrongful conduct with respect to DLI.

Talking Capital was a predecessor to VoIP Guardian, and this claim should be disallowed. Similarly, Counter-Party QuarterSpot worked with Ross to misreport borrower payments. This claim should also be disallowed.

The Receiver does not believe the claim of Three Line Capital is a valid claim and will object if necessary, but also is in negotiation with this Counter-Party about potential resolution and liquidation of DLI's position in Three Line Capital, which would also resolve its claim. Finally, as noted above on page 24, note 14, the claim of Investment L will be withdrawn.

## VII.   CONSOLIDATION OF MULTIPLE ACCOUNTS UNDER PLAN IS APPROPRIATE.

The Distribution combines multiple accounts held by a single taxpayer identification number. The Receiver believes that such treatment will prevent disparate outcomes between a DLIF Investor with a single account and similarly situated DLIF Investors who may hold multiple accounts, each with different pre-Receivership recovery rates. Consolidating multiple "accounts" associated with the same person is equitable under the facts of this case. A DLIF Investor in this scheme is not injured more or less simply by virtue of investing money in multiple accounts or accounts differently titled. And other DLIF Investors should not suffer or benefit on account of another DLIF Investor's method of holding title to multiple accounts. As such, it is equitable to consolidate accounts of a given DLIF Investor to prevent disparate outcomes between that DLIF Investor and similarly situated DLIF Investors.

Courts have recognized that consolidating "accounts" is equitable. In *Equity Financial Group*, 2005 U.S. Dist. LEXIS 20001, at *88, the district court recognized that consolidating an investor's accounts, even when held in different capacities, was equitable. *The Equity Financial* court noted that, "not to consolidate would permit an investor who used different investment vehicles and received funds in one account to

obtain a disproportionately large distribution when compared to other single account investors." *Id.*

The Receiver has identified TINs associated with the DLIF Investor accounts and proposes the following relief in the Distribution Plan relating to multiple accounts:

1.  To the extent that a TIN is associated with multiple accounts, those accounts and associated claims will be aggregated for purposes of calculating that DLIF Investor's claim and distribution amounts except for the following multiple accounts: Trust accounts, retirement accounts, and accounts of separate Persons (even those that may share a TIN with other trust or non-trust accounts) when the Receiver reasonably believes those trust, retirement, and other accounts and associated claims represent separate interests. In such circumstance, the trust, retirement, and other accounts and associated claims will not be aggregated for purposes of calculating the claim and distribution amounts for those accounts.

2.  While claim amounts and total distribution amounts to a given DLIF Investor will be determined at the TIN level, if multiple investment accounts share the same TIN, the Receiver would then allocate the resulting distribution amount attributable to a given DLIF Investor across individual accounts that share the same TIN, with such allocation to be made pro-rata based on the account-level Net Investment Loss amount. In the event such allocation may not be feasible despite the Receiver's reasonable efforts, the Receiver will make distributions to the DLIF Investor based on the TIN level attribution. The Receiver will determine in his sole discretion whether distribution payments will be made directly to DLIF Investors or to the account custodians, as applicable. The Receiver is not responsible for compliance with investors' individual investment account rules and tax consequences.

Here, for the same reasons as recognized by the district court in *Equity Financial Group,* the Receiver requests that this Court authorize the above procedures such that the Receiver may consolidate related accounts, as appropriate to serve equitable ends.

## VIII.  AN INTERIM DISTRIBUTION OF $150 MILLION IS APPROPRIATE

The Receiver requests authority to make an interim distribution of $150 million at this time. Specifically, the Receiver requests authority to pay or reserve funds as follows:

1. Class 1 Administrative claims: The Receiver will pay all allowed fees and expense claims of professionals. To the extent that no court approval has yet been obtained, or the Receiver intends to object to a claim, the Receiver will reserve funds for the full amount of the filed claims pending resolution.

2. Class 2 Priority claims: The Receiver will pay all allowed Tax Claims.

3. Class 3: The Receiver will pay DLIFF's *pro rata* share, to be shared with Class 4 based upon the terms of the Claims Stipulation, of the remaining funds up to the proposed $150 million interim distribution following payment or reserves for Classes 1 and 2.

4. Class 4: The DLIF Investors will receive distribution of their *pro rata* share of the distribution to be made to Class 4B, to be shared with Class 3, up to the amounts of the proposed $150 million interim distribution following payment or reserves for Classes 1, 2 and 4A.

The Receiver believes that an interim distribution of $150 million is appropriate and reasonable. The Receiver will continue to hold approximately $50 million of undistributed cash on hand, and he anticipates collecting an additional $85 million in connection with the loan portfolios. Additionally, the Receiver is at the beginning stages of pursuing litigation claims and believes that additional recoveries may result from his litigation efforts.

## IX.    NOTICE OF THE HEARING ON THIS MOTION SHOULD BE DEEMED APPROPRIATE AND SUFFICIENT

The Receiver has served notice of the hearing on this Motion on the parties and by mail to the known non-investor creditors of the Receivership Entity. The Receiver has posted the notice of hearing and the Motion on the Receiver's website (https://cases.stretto.com/dli).  The Receiver has also directed Stretto, his Court-approved claims agent, to email the notice of hearing to all investors. The Receiver believes this notice complies with the provisions of Local Civil Rule 66-7 to the extent that notice to investors is required. The Receiver requests that the Court approve this form of notice as reasonable, appropriate, and the most cost-effective means of providing notice of the hearing under the circumstances, since there are approximately 975 investors both in the United States and overseas, and to the extent necessary, to approve the notice given as reasonable, limited notice appropriate under the circumstances and in the interests of time and cost. This Court, as a court of equity supervising the receivership estate, may make appropriate administrative orders governing the receivership, including limitations on and changes in notice and other procedures. *See* F.R. Civ. P. 5(a) and (c) (authorizing the court to modify service procedures when numerous defendants are involved in litigation). In addition, pursuant to Local Civil Rule 66-8, a receiver is directed to administer receivership estates in a manner "as nearly as possible in accordance with the practice in the administration of estates in bankruptcy." Orders limiting notice when the Bankruptcy Code or Rules would otherwise require notice to all creditors are routinely granted in bankruptcy cases to promote the expeditious and economical administration of bankruptcy estates. *See In re First Alliance Mortgage Co.*, 269 B.R. 428, 442 (C.D. Cal. 2001) (referencing in *dicta* in the court's recitation of facts the bankruptcy court's order limiting notice issued in that case); 11 U.S.C. § 102(1)(A) (defining the phrase "after notice and a hearing" to mean "after such notice as is appropriate in the particular circumstances, and such opportunity for hearing as is appropriate in the particular circumstances").

## X.   CONCLUSION

WHEREFORE, the Receiver respectfully requests that the Court grant the Motion and all relief requested therein.


DATED: November 20, 2020          DIAMOND McCARTHY LLP

By:   /s/ *Kathy Bazoian Phelps*
      Kathy Bazoian Phelps
      Counsel for Bradley D. Sharp,
      Permanent Receiver

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF RECEIVER FOR APPROVAL OF: DISTRIBUTION PLAN; RISING TIDE DISTRIBUTION METHODOLOGY WITH RESPECT TO DLIF INVESTOR CLAIMS; PROPOSED INTERIM DISTRIBUTION; AND NOTICE OF DISTRIBUTION PLAN